THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REGINALD MAYES, Defendant-Appellant.

First District (5th Division)   No. 1—89—3494

Opinion filed December 17, 1993.

Rita A. Fry, Public Defender, of Chicago (Anne C. Myles-Smith and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William Carroll, and Michael J. Pugh, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant, Reginald Mayes, was convicted of attempted murder, home invasion, and aggravated battery. The trial judge sentenced him to 60 years in the Illinois Department of Corrections for home invasion, 20 years for attempted murder to run consecutively, and five years for aggravated battery to run concurrently.

FACTS

The charges against defendant arose from events in the early morning hours of April 26, 1988, in the apartment of Thomas Leuders and his fiancee, Barbara Carlson. The apartment was on the first floor at 225 West Washington in Oak Park. At trial, Thomas Leuders testified to the following sequence of events. He and Ms. Carlson had retired for the night at approximately 10:30 or 11 p.m. on April 25,

1988. Shortly before 2 a.m., Mr. Leuders awoke and saw defendant holding a shimmering object and crawling on the bed toward Ms. Carlson. Mr. Leuders yelled and began kicking the covers off the bed. Defendant raised up to a kneeling position, looking at Mr. Leuders, at which time Mr. Leuders kicked defendant in the face, knocking him off the bed and against a wall. Leuders then jumped on defendant and the two men wrestled on the floor. During this struggle Mr. Leuders felt what he thought was a cold object being pressed into his back and a sudden weakness. Defendant freed himself and ran from the room. Mr. Leuders followed down the hallway, but did not see defendant. As Mr. Leuders was checking the apartment to make sure defendant had left, he heard a car start in the alley and then he noticed blood and realized that he had been stabbed.

The parties stipulated that if the physician who examined Mr. Leuders at the hospital were to testify, she would state that Mr. Leuders had been stabbed once in the forearm and three times in the back, the back wounds being to both sides of the chest cavity causing both lungs to partially collapse. The doctor's testimony also would have indicated that Mr. Leuders suffered superficial wounds to the left groin area.

The day after the incident, Mr. Leuders identified defendant from a photographic array. He also identified defendant in a lineup about two weeks later and at trial.

Oak Park police officer James Leahy testified that he went to the apartment in the early morning hours of April 26 and determined that a screen and window in the dining room had been forced open. He found a latent palm impression on the window sill. A police technician testified that there was no doubt that the latent palm impression was that of defendant.

Defendant lived in the apartment building across the street at 222 West Washington. At trial defendant testified that on the evening of April 25, he had gone to his girl friend's home on the south side of Chicago to pick up her car which he was to repair. He then went to his brother's house on the west side to get a tool and to a friend's house on the west side. He returned home and did not leave his apartment until the following morning.

The jury found defendant guilty of home invasion, aggravated battery, and attempted murder, while finding defendant not guilty of residential burglary and armed violence.

Because one of the issues raised on appeal concerns the prosecutor's use of peremptory challenges, we also describe the *voir dire* proceedings. Throughout this opinion, we will use the term "black" rather than "African American" because that is the term used by defendant in his brief.

The record does not indicate the total number of persons in the venire. Thirty-two persons were questioned during *voir dire*. The races of seven of those persons cannot be ascertained from the record. It can be inferred from the record that 6 of the remaining 25 were black and 19 were nonblack. A nonblack juror was excused during the trial and replaced by the first alternate juror. The jury which deliberated in the case consisted of 2 blacks and 10 nonblacks. The race of the second alternate juror, who did not deliberate, is not in the record.

Defendant exercised six peremptory challenges, four being against nonblacks and two being against persons whose race cannot be ascertained from the record. The prosecutor exercised three peremptory challenges, two against blacks, one against a nonblack. The remaining nine prospective jurors were excused for cause by the trial judge. Of those nine, the race of four cannot be determined from the record, while two were definitely black and three were definitely nonblack.

Of the first four prospective jurors to be questioned, all of whom were nonblack, the defense exercised a peremptory challenge against one and three were accepted for the jury. Anthony Smith, a 38-year-old single black man, was questioned next. When the judge asked how long he had lived on the southwest side of Chicago, he answered, "Well, it's kind of like been off and on. I kind of like move, you know, so I am like there now, but as far as you know like my mother or whatever, you know, it's like—." Upon further questioning, it appeared that Mr. Smith had lived with his mother off and on for 20 years. Many of his answers were much like his answer to the first question, containing several "you knows" and "likes" and taking some time to get around to the answer. When asked if he owned his home or rented, he stated that he rented. Mr Smith was a nursing assistant at a hospital. He received his training as part of a job training program at Bethany, which he said was affiliated with City-wide Colleges. He had one three-year-old child who did not live with him but whom he supported. He had been called to Federal jury duty but he did not actually serve on a jury because the case was dismissed before trial.

Mr. Smith's brother had been the victim of a homicide and armed robbery in 1980. The defendant in that case had been acquitted. Mr. Smith indicated that this would not affect his ability to be fair. During questioning by the defense attorney, Mr. Smith volunteered that he could be fair although the case might be depressing because it brought back memories of his brother's situation.

The prosecutor asked Mr. Smith whether getting off work would

be a problem since he had only been at his current job a short time. Mr. Smith indicated it was not a problem. The prosecutor also ascertained that Mr. Smith had 10 brothers and sisters. He then asked some questions about Mr. Smith's Federal jury service. At that point, the prosecutor exercised his first peremptory challenge against Mr. Smith.

Defense counsel then asked that the judge request a reason for the prosecutor's exclusion of Mr. Smith, in accordance with *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Defense counsel stated for the record that Mr. Smith was black and that defendant was also black. The judge stated:

"Well, first of all, the Batson case shows a systematic exclusion of blacks from a jury. He is the first black who appeared on this jury. Why do—I don't see a definition where I can find they systematically excluded blacks and I can't look to the future that they will exclude anymore [ *sic*] blacks on there.

At this point I don't think there is any reason to question why they removed that party *** I see no systematic exclusion of blacks at this point. This if [ *sic*] the first black that's been excused."

The defense attorney then stated that Mr. Smith was the first black person to be questioned and he saw no reason to have excluded him other than the fact of his race. At this point, the prosecutor stated, "Other than he can't even give us a straight answer to the simple questions of where do you live, where do you work." The following exchange then took place:

"THE COURT: You are willing to give a reason?

MS. KELLY [Prosecutor]: No, I don't feel I have to.

THE COURT: You have already done that.

MS. KELLY: That's fine. It's on the record so—

THE COURT: You have already done that. That must be— are you saying that's part—

MS. KELLY: Those are certainly part of my reasons, certainly.

THE COURT: I believe they don't have to.

MR. MASH [Defense Counsel]: I think she is clouding up the record in terms of you're either going to ask her to give you the reasons—

THE COURT: I didn't ask her anything. I don't believe she has to.

MR. MASH: I would object to her volunteering things that she knows may cloud up the record enough to avoid the issue if it's raised in another tribunal.

THE COURT: I don't believe at this point there is a showing of systematic exclusion of Afro Americans, and I say that seriously. There has only been one Afro American called. At this point you

have made your record and I have listened to it and I have made my ruling. I made my ruling. I don't believe there is."

Defense counsel then moved for a mistrial. After some discussion, the judge denied the motion stating:

"I believe that at this point, I would not ask for a reason from the State. There has been one black person, Afro American person, who was excused. I don't believe that sets a pattern. *** There may come a time later in this where I will have to ask the State to explain even the first one if there is more of this, but this in itself is just a peremptory challenge. *** At this point I don't believe the Court says expressly that this is tainted or grounds for a mistrial."

Of the next 16 prospective jurors to be questioned, it can be inferred from the record that 3 were black and 13 were not black. The court excused 4 of these 16 for cause, one of whom was black. Defense counsel exercised peremptory challenges in three instances, each prospective juror being nonblack. Seven were accepted as jurors, including Ernest Green, who was black. The prosecutor exercised peremptory challenges to excuse Thomas Trabasso, a nonblack who was a university faculty member with two children in their twenties, and Margaret Reed, a black woman.

Ms. Reed was a divorced nurse's assistant who was originally from Mississippi. She did not own her own home. She had two sons, ages 30 and 34, one of whom was a minister. When the prosecutor asked about the minister's schooling, Ms. Reed could not remember where her son had received his training. When asked by the prosecutor whether her ability to be fair to defendant would be affected by the fact that defendant was about the same age as her sons, she replied that it would have no effect.

After the prosecutor exercised the peremptory challenge in Ms. Reed's case, defense counsel objected on the grounds that Ms. Reed's exclusion was based on her race. Defense counsel asked the court to require the prosecutor to state a valid basis for the exclusion. The court replied, "I agree. Give me a basis." The prosecutor replied that Ms. Reed had two sons near the defendant's age of 34, one of whom was a minister, she rented her home, she was not very attentive or aware of what was going on, and she was somewhat evasive when asked about her son's ministerial training. The defense counsel noted, without providing any names, that a number of persons already selected for the jury also had more than one child close in age to the defendant. The court stated that there was no systematic exclusion of blacks and found the State's reasons for Ms. Reed's exclusion sufficient. Defense counsel then moved for a mistrial, which the court denied.

*Voir dire* continued with 11 more prospective jurors being questioned. The record does not reflect the race of 7 of these 11 persons. Of those seven, the trial judge excused four for cause, defense counsel exercised two peremptory challenges, and one was selected as the second alternate juror. Two of the four remaining prospective jurors were black and two were nonblack. The trial judge excused one of the two blacks for cause. The other black and the two non-blacks were selected as jurors and first alternate, all three of whom were on the jury of 2 black persons and 10 nonblack persons which deliberated.

Defendant appeals his conviction on three grounds. He contends that (1) the trial court erred in denying his motions for mistrial during jury selection, (2) the verdicts returned by the jury were inconsistent because they required different mental states, and (3) his convictions for aggravated battery and attempted murder were based on the same physical act, and, therefore, one of those convictions must be reversed.

*BATSON* ISSUES

Defendant first contends that the trial judge erred in denying his two motions for mistrial based on the prosecutor's peremptory challenges to exclude Anthony Smith and Margaret Reed from the jury. Defendant claims the motions should have been granted because, as required under *Batson* (476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712), defendant established a *prima facie* case of purposeful racial discrimination which was not rebutted by the State.

It is constitutionally impermissible for a prosecutor to challenge potential jurors solely because of their race. (*Batson v. Kentucky*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719.) Prior to *Batson*, in order to establish a constitutional violation, a defendant was required to show repeated exclusion of members of a particular race over a number of cases. (*Batson*, 476 U.S. at 92, 90 L. Ed. 2d at 84-85, 106 S. Ct. at 1720.) In *Batson*, the United States Supreme Court ruled that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) Under *Batson* and its progeny, in order to establish this *prima facie* case defendant must demonstrate that "relevant circumstances" raise an inference of purposeful discrimination based on race. *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Edwards* (1991), 144 Ill. 2d 108, 152-53, 579 N.E.2d 336, *cert. denied* (1992), 504 U.S. 942, 119 L. Ed. 2d 204, 112 S. Ct. 2278.

Possible "relevant circumstances" include, but are not limited to: "whether the defendant and the excluded venirepersons share the same race; a pattern of strikes against black venirepersons; the prosecutor's questions and statements during *voir dire* and in exercising his challenges; whether there has been a disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire as compared to the jury; the race of the defendant and the victim; and the race of the witnesses." (*People v. Peeples* (1993), 155 Ill. 2d 422, 469, 616 N.E.2d 294, *cert. denied* (1993), 510 U.S. 1016, 126 L. Ed. 2d 214, 114 S. Ct. 262.)

A trial court's determination as to whether a defendant has established a *prima facie* case is a finding of fact which will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Garrett* (1990), 139 Ill. 2d 189, 200-01, 564 N.E.2d 784.

Once a defendant establishes a *prima facie* case of purposeful discrimination, the burden shifts to the prosecution to establish that its reasons for the peremptory challenges are race-neutral. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) The reasons given by the State need not rise to the level necessary to justify exclusion for cause, but they must constitute more than a mere denial of a discriminatory motive. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24.) The prosecutor must give clear and reasonably specific, legitimate, race-neutral reasons related to the particular case. (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20.) Generally, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." (*Hernandez v. New York* (1991), 500 U.S. 352, 365, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869.) Therefore, the trial court's findings as to the sufficiency of the reasons given by the State must be accorded great deference and will not be disturbed on review unless against the manifest weight of the evidence. *People v. McDonald* (1988), 125 Ill. 2d 182, 199, 530 N.E.2d 1351.

Defendant contends in his brief that he established a *prima facie* case of purposeful discrimination. In support of his contention, he states that the State exercised a disproportionate number of peremptory challenges against prospective black jurors (two-thirds), the defendant is black and the victim is white, and the two blacks

challenged by the State were heterogeneous, their race being their only common characteristic. Defendant further contends that the State failed to offer sufficient race-neutral reasons for the challenges and, thus, failed to rebut the *prima facie* showing of purposeful discrimination.

The trial court's refusal to ask for reasons for Mr. Smith's challenge combined with denial of the motion leads to the conclusion that the trial court found that defendant had not established a *prima facie* case at that time. (See *United States v. Lane* (4th Cir. 1989), 866 F.2d 103, 105.) By his references to "systematic exclusion" and the absence of a "pattern," it does appear that, contrary to *Batson*, the trial judge believed the only relevant circumstance to be considered was a pattern of strikes which, of course, could not be established on the basis of the first peremptory challenge of a black person. However, "the standard of review by which we are bound must apply to the correctness of the trial court's decision and not to the correctness of its stated reasons." *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 713, 558 N.E.2d 1345 (trial court may not have considered all relevant factors, as it erroneously concluded that there must be 100% exclusion of blacks to establish *prima facie* case).

The State claims that defendant has waived the issue of whether a *prima facie* case was established because defendant has not properly preserved the record for review. The State correctly notes that the record does not reflect the race of every potential juror reached during *voir dire*. The State also asserts that the race of every seated juror does not appear in the record. We note, however, that the trial judge stated, during argument of the post-trial motion, that the jury which deliberated included 2 blacks and 10 nonblacks. It can be inferred from the record that all of the first 10 jurors selected were nonblack, except for Mr. Green, who was black. It can also be inferred that of the last two jurors and the first alternate, who served on the jury, one was black (although it cannot be determined which one) and two were nonblack.

While it is defendant's responsibility to preserve the record for review, including the record of *voir dire* proceedings (*People v. Brown* (1987), 152 Ill. App. 3d 996, 1002, 505 N.E.2d 397), our supreme court in *People v. Pasch* (1992), 152 Ill. 2d 133, 604 N.E.2d 294, found that, although the races of venirepersons should be available to facilitate a meaningful review, the absence of that information in the record cannot overcome strong evidence of a *prima facie* case. The court reviewed the *prima facie* case determination based on the relevant information available in the record. *Pasch*, 152 Ill. 2d at 160.

■ Because there is sufficient information in the record from

which to draw conclusions regarding the existence of a *prima facie* case, we will examine the trial court's findings based on the information available, construing any ambiguities against defendant. See *People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234, *cert. denied* (1991), 502 U.S. 882, 116 L. Ed. 2d 189, 112 S. Ct. 233 (races of those challenged and number of challenges were ascertained by the reviewing court, construing ambiguities in the record against defendant).

Because the first objection came after only one black person had been questioned, most of the factors normally considered did not apply to the court's determination at that time. Clearly, where only one black person was questioned, no inference of discriminatory purpose can arise based on a pattern of strikes, a disproportionate number of strikes against blacks, or heterogeneous characteristics of excluded black jurors. Moreover, although defendant states in his brief that he is black and the victims are white, the page of the record cited for the fact that the victims are white does not, in fact, indicate the victims' race. The State contends that the record does not establish the victims' race. We nevertheless conclude that, even if the victims' race could be ascertained from the record, the facts that the defendant and the victims are of different races and that the defendant and the excluded juror are of the same race cannot, by themselves, establish a *prima facie* case of purposeful discrimination. (*Peeples*, 155 Ill. 2d at 472.) Therefore, the court's finding that defendant had not established a *prima facie* case at that stage of the *voir dire* was not against the manifest weight of the evidence.

In arguing that he established a *prima facie* case of purposeful discrimination in the case of Mr. Smith's exclusion, defendant relies not only on the *voir dire* information available at the time the challenge of Mr. Smith occurred, but on information from the entire *voir dire* process. However, we note that, although the trial judge stated he might need to question the prosecutor about Smith's exclusion later, defendant never requested that the trial court reconsider its *prima facie* case ruling as to Mr. Smith, either at the time of Ms. Reed's exclusion or at any other point during *voir dire*. Since defendant did not ask the court to reconsider its finding in light of subsequent events, it can be argued by analogy that defendant has waived the issue on review. (See, *e.g.*, *Isenhart v. Seibert* (1955), 6 Ill. App. 2d 220, 227, 127 N.E.2d 469 (where court ruled expert's answer to hypothetical question was admissible but would be stricken if elements were not subsequently put into evidence, failure to make subsequent motion to strike constituted waiver); *Lundquist v. Nickels* (1992), 238 Ill. App. 3d 410, 430, 605 N.E.2d 1373 (denial of

motion to exclude testimony was premised on expectation that certain evidence would be admitted at trial; failure to renew motion when that evidence was not submitted resulted in waiver).) However, as shall be discussed below, the result remains the same even if we were to hold that there was no waiver with respect to the Smith exclusion. We will examine the relevant factors, stated earlier, which are set forth in *Peeples* (155 Ill. 2d at 469), to aid in determining whether a *prima facie* case of purposeful discrimination exists.

■ The first relevant circumstance set forth in *Peeples* is whether the defendant and the excluded prospective jurors share the same race. Here, defendant, Mr. Smith, and Ms. Reed are black. As previously discussed, although this circumstance is relevant, it is not dispositive in determining whether a *prima facie* case exists. The same is true of the circumstance where the defendant is of a different race than the victim or the witnesses, although we note that in the present case the record does not reflect the race of the victim or the witnesses. See *Peeples*, 155 Ill. 2d at 472 (facts that the defendant and the victims were of different races and that the defendant and the excluded juror were of the same race not sufficient to establish a *prima facie* case of purposeful discrimination).

We next consider whether there is a pattern of strikes against blacks. "To create a pattern, strikes should do more than occasionally involve venire members of a certain race. The strikes should affect those members to such a degree or with such a lack of apparent non-racial explanation as to suggest the possibility of racial motivation ***." (*People v. Hope* (1990), 137 Ill. 2d 430, 463, 560 N.E.2d 849, *vacated on other grounds* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792.) For example, in *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 558 N.E.2d 1345, a pattern of strikes against blacks existed where the exclusion of five of six black veniremembers did "not appear to be random, coincidental, or occasional so as to be devoid of possible racial motivation." (*Lockhart*, 201 Ill. App. 3d at 710.) In the present case, the prosecutor challenged two black venirepersons. Between those two challenges, the prosecutor challenged one nonblack and accepted one black as well as several nonblacks for the jury. We see no discernible pattern to this conduct, nor does defendant make such a contention.

In this context we also consider whether there has been a disproportionate use of strikes against blacks. The State exercised two-thirds, or 67%, of its peremptory challenges against blacks. In *People v. Henderson*, the prosecutor exercised 60% of his peremptory strikes, 6 of 10 challenges, against blacks. (*Henderson*, 142 Ill. 2d at 280.) There, our supreme court stated that this factor only slightly

tended to suggest purposeful discrimination, while other factors were either neutral or tended to refute the suggestion. The court found that the trial court's determination that a *prima facie* case had not been established was not against the manifest weight of the evidence. (*Henderson*, 142 Ill. 2d at 288; but see *People v. Seals* (1987), 153 Ill. App. 3d 417, 423, 505 N.E.2d 1107 (6 of 10 challenges against blacks established *prima facie* case).) We note that in the present case, the universe of three challenges is even smaller than the universe of 10 challenges in *Henderson*. Therefore, it would seem that, despite the fact that the proportion is slightly higher in this case, any suggestion of purposeful discrimination to be derived from this factor in the present case would be even less significant than in *Henderson*. In *People v. Valentine* (1991), 221 Ill. App. 3d 1082, 582 N.E.2d 1338, the State exercised only two peremptory challenges, both against blacks. (*Valentine*, 221 Ill. App. 3d at 1086.) While the issue of a *prima facie* case was moot because the trial judge had requested reasons from the prosecutor, this court commented:

> "[T]he State should not be called upon to reveal its rationale for eliminating certain prospective jurors, or have that rationale questioned, unless the defense is able to articulate, in clear and reasonable terms, the circumstances that led it to believe that race motivated the challenges. This was not done in this case." (*Valentine*, 221 Ill. App. 3d at 1087.)

Thus, it would seem that in some instances where the prosecutor exercises relatively few challenges a disproportionate effect would not, by itself, tend toward an inference of purposeful discrimination. In determining whether a *prima facie* case has been established, a court must consider more than merely the numbers of jurors excluded. *Lockhart*, 201 Ill. App. 3d at 711.

We turn next to whether the excluded black veniremembers were heterogeneous in all aspects other than their race. Contrary to defendant's contention, they were not. Mr. Smith and Ms. Reed were both unmarried, both renters, both employed as nursing assistants.

As to the level of black representation on the jury compared to black representation on the venire, all the information needed for this determination is not in the record. Two of the twelve jurors who deliberated, or 16.67%, were black. There were six persons questioned during *voir dire* who are known to be black. Construing missing or ambiguous data against defendant, who has the burden to preserve the record, *i.e.*, assuming the remaining 26 persons reached during *voir dire* were nonblack, 18.75% of the venire was black, and 17.4% of those not excused for cause during *voir dire* were black. We consider this disparity too slight to raise an inference of discriminatory intent.

Another relevant factor stated in *Peeples* is whether the prosecutor's questions and comments raise an inference of discriminatory intent. The defendant in the present case makes no such claim, nor does the record reflect any such questions or comments by the prosecutor.

To summarize, the only relevant circumstances in this case which lean toward a suggestion of discriminatory intent are the fact that the excluded jurors were of the same race as defendant and the fact that two of three challenges by the prosecutor were against blacks. The remaining circumstances are either neutral or tend to refute the suggestion of purposeful discrimination. Furthermore, we note that the prosecutor in this case did not use all of the peremptory challenges allotted to her and she accepted two blacks on the jury. The fact that a prosecutor does not use remaining challenges to strike black veniremembers may further indicate an absence of discriminatory intent. (*People v. Knott* (1991), 224 Ill. App. 3d 236, 251, 586 N.E.2d 479.) Therefore, the trial court's finding that no *prima facie* case was established was not against the manifest weight of the evidence.

In oral argument, however, defendant, relying on *Hernandez*, contended that, because the prosecutor gave reasons for both peremptory challenges, the issue of whether defendant established a *prima facie* case is moot. See *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.

In *Hernandez*, the Court stated, "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.) In that case, the Court examined only the trial court's ruling that the reasons offered by the prosecutor were valid and race-neutral. *Hernandez*, 500 U.S. at 369-70, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871-72.

■ In analyzing the reason articulated by the State for Mr. Smith's exclusion, we find that the reason was race-neutral on its face and, therefore, sufficient under *Batson* standards. The prosecutor's stated reason which focused upon Mr. Smith's inability to answer questions in a direct manner would be sufficient standing alone. Although where a prospective juror's demeanor is the stated reason for exclusion, there is a greater risk of that reason being pretextual (see *People v. Harris* (1989), 129 Ill. 2d 123, 176, 544 N.E.2d 357, *cert. denied* (1990), 494 U.S. 1018, 108 L. Ed. 2d 498, 110 S. Ct. 1323), a prospective juror's demeanor has nevertheless long been

held to be a legitimate basis for a peremptory challenge. (See *Harris*, 129 Ill. 2d at 176; see also *People v. Young* (1989), 128 Ill. 2d 1, 20, 538 N.E.2d 453; *People v. Jones* (1990), 201 Ill. App. 3d 440, 447-48, 559 N.E.2d 112, *cert. denied* (1992), 503 U.S. 974, 118 L. Ed. 2d 309, 112 S. Ct. 1563.) In *Young*, the court upheld the trial court's finding that the prosecutor's reason for a peremptory challenge was valid where the prosecutor stated that the prospective juror was hesitant in responding to some questions. (*Young*, 128 Ill. 2d at 19-21.) In the present case, the record shows that Mr. Smith had a great deal of difficulty answering the questions posed during *voir dire*. This, by itself, is a sufficient, race-neutral basis for the peremptory challenge.

Moreover, we further note that the State did not purport to give all of its reasons for discharging Mr. Smith, but only "part of [its] reasons." The court refused to elicit the prosecutor's additional reasons at that time. Under those circumstances, where less than all of the State's reasons were elicited and purportedly articulated, it would seem that, even under *Hernandez*, it would be unfair to permit the partial reason to control unless it were discriminatory on its face.

In considering the peremptory challenge of Ms. Reed, we note that the prosecutor offered all of her reasons for the challenge, that such reasons were elicited from her by the court, and that the trial court found the reasons to be valid and race-neutral. Thus, with respect to Ms. Reed, *Hernandez* clearly applies so that we need only examine whether the trial court's finding that the reasons were sufficient was against the manifest weight of the evidence. See *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866 (the prosecutor having articulated a basis for the challenge and the trial judge having ruled on the ultimate question of intentional discrimination, the issue of a *prima facie* case is moot).

The record indicates that Margaret Reed was a nursing assistant. She was divorced and had two sons, ages 30 and 34. One son was a clergyman; the other worked for a candy company. She had never been the victim of a crime, nor had anyone in her family. The reasons given by the State for the peremptory challenge were that Ms. Reed had two sons near defendant's age, one of whom was a minister, she rented rather than owned her home, she was not very attentive or aware of what was happening, and she was somewhat evasive when questioned about her son's ministerial education.

We note preliminarily that case law is clear that a prospective juror's status as a renter rather than a homeowner and the fact that a juror has children near defendant's age can both be legitimate, race-neutral reasons for a peremptory challenge. (See *People v. Mack* (1989), 128 Ill. 2d 231, 243-44, 538 N.E.2d 1107, *cert. denied* (1990),

493 U.S. 1093, 107 L. Ed. 2d 1072, 110 S. Ct. 1170 (renter status); *People v. Baisten* (1990), 203 Ill. App. 3d 64, 79, 560 N.E.2d 1060 (age of children).) Similarly, as stated earlier, a prospective juror's demeanor, including inattentiveness or hesitancy in answering questions can be a legitimate, race-neutral basis for the exercise of a peremptory challenge. See *Young*, 128 Ill. 2d at 19-21 (hesitancy); see also *People v. Johnson* (1991), 218 Ill. App. 3d 967, 986, 578 N.E.2d 1274 (inattentiveness).

Defendant, however, contends that the reasons given for Ms. Reed's exclusion were a pretext because a nonblack selected for the jury, Sandra Innes, also rented her home and two other selected jurors, Natalie Vasquez and Johnny Rivers, also had children close in age to defendant, who was 34. Defendant also challenges the State's assertions that Ms. Reed was inattentive and unaware and that her answers were evasive.

Although it is a factor to be considered, the fact that a prosecutor exercises a peremptory challenge against a black member of the venire for a certain reason, but does not exercise a peremptory challenge against a nonblack person who then becomes a juror, does not necessarily mean that the prosecutor's race-neutral explanation for the challenge is a pretext. The nonblack juror may possess other traits which the prosecutor reasonably believed would outweigh the trait considered to be undesirable in a juror. (*Young*, 128 Ill. 2d at 23-24.) For example, in *People v. Hudson* (1993), 157 Ill. 2d 401, the prosecutor gave gender as one reason for a peremptory challenge against a woman. The court wrote:

"Defendant contends that the State's rationale for desiring more men to balance out the jury was pretextual since the next two venirepersons accepted by the State were women, namely Diane Nummy and Maria Mentanis. We note, however, that although Nummy, Mentanis and Praser shared a trait which the State regarded as undesirable, only Nummy and Mentanis possessed another trait which the State believed made them desirable as jurors. [Citation.] Unlike Praser, Nummy and Mentanis were employed. Consequently, the fact that Nummy and Mentanis were female was outweighed by their employment, which made them desirable to the State as jurors and distinguished them from Praser." *People v. Hudson*, 157 Ill. 2d at 433-34.

Neither Ms. Innes, Ms. Vasquez, Mr. Rivers, nor any other juror possessed all or most of the same characteristics in combination as Ms. Reed. While it is true that Sandra Innes was a renter and that Natalie Vasquez had three daughters and one son ranging in age from 26 to 33 and Johnny Rivers had a 29-year-old son, the record

shows other characteristics and family background which differentiate Ms. Reed from those three jurors. Most notably, the record contains no indication that Ms. Innes, Ms. Vasquez, or Mr. Rivers was inattentive, unaware, or evasive. Moreover, as to Johnny Rivers, the record does not indicate his race, nor can it be inferred from the record.

With respect to defendant's denial that Ms. Reed was inattentive, unaware and evasive, we note that the trial court, experienced in conducting *voir dire*, and having observed the demeanor of Ms. Reed and the other prospective jurors during the *voir dire* proceedings, was in the best position to determine whether those reasons given by the prosecutor were legitimate rather than pretextual. (See *Young*, 128 Ill. 2d at 21 (upholding trial judge's finding that prosecutor's concern about prospective juror's hesitation in responding to certain questions was not pretextual).) "Trial judges are especially well-suited to make this determination because they are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one." (*Jones*, 201 Ill. App. 3d at 446-47.) The trial court's determination must be given great deference. (*Young*, 128 Ill. 2d at 21; see also *People v. Hudson*, 157 Ill. 2d at 433 (great deference given to trial court's ruling which is "based largely on an assessment of the State's credibility").) Based on our review of the record, we conclude that the trial judge's determination, that the reasons given for Ms. Reed's exclusion were sufficient, was not against the manifest weight of the evidence.

INCONSISTENT VERDICTS

Defendant next contends that the guilty verdicts as to attempted murder and aggravated battery are legally inconsistent because each requires a different mental state. Therefore, defendant concludes that reversal or a new trial is required. "Inconsistent verdicts occur when a verdict on one count is premised on the existence of an element of the offense and a verdict on another count is premised on the nonexistence of the same element." *People v. Ortiz* (1987), 156 Ill. App. 3d 170, 176, 509 N.E.2d 633.

Defendant contends that the intent to kill and the intent to cause bodily harm are mutually exclusive. In support of this contention defendant cites to *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139, and *People v. Coleman* (1985), 131 Ill. App. 3d 76, 475 N.E.2d 565. However, those cases are not on point, as all of them deal with the

inconsistency of guilty verdicts where one crime requires recklessness as an element and the other crime requires that the defendant acted intentionally or knowingly. Those cases stand for the proposition that, because a person cannot act recklessly and at the same time act intentionally and knowingly, a guilty verdict based on the mental state of recklessness is inconsistent with a guilty verdict based on intentional or knowing behavior. Moreover, only in the *Spears* case was there a series of acts rather than one single act upon which the verdicts were based. (See *Hoffer*, 106 Ill. 2d at 191 (one gunshot); see also *Coleman*, 131 Ill. App. 3d at 77 (one gunshot).) The *Spears* case, which involved three gunshots, acknowledges that, although not applicable in that particular case, it is possible for a jury to rationally find that separable acts could each be accompanied by a different mental state, and therefore, each act could support a different verdict and the two verdicts would then be consistent. *Spears*, 112 Ill. 2d at 404-05; see also *People v. Roman* (1981), 98 Ill. App. 3d 703, 706-07, 424 N.E.2d 794 (jury could rationally have concluded that the defendant fired the first two shots recklessly, but fired the third shot knowingly).

One of the elements of attempted murder is that the defendant must have intended to kill. (*People v. Harris* (1978), 72 Ill. 2d 16, 24, 377 N.E.2d 28; *People v. Coleman* (1985), 131 Ill. App. 3d 76, 79-80.) One of the elements of aggravated battery is that the defendant intentionally or knowingly caused great bodily harm. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4.) Thus, in the present case, the main issue regarding the consistency of the verdicts is whether one can intend to kill a person and, at the same time, intend to cause bodily harm or knowingly cause bodily harm. This question was addressed in *People v. Solis* (1991), 216 Ill. App. 3d 11, 576 N.E.2d 120. There, the court ruled that the verdicts of guilty for aggravated battery and attempted murder were not legally inconsistent because the mental states for the crimes were not mutually exclusive. (*Solis*, 216 Ill. App. 3d at 20-21.) The court stated:

> "Defendant's argument that he could not have intended both to kill and to do great bodily harm to the victim is erroneous. This argument is based upon the invalid presumption that death is not a form of bodily harm and that one may intend to kill another without intending to inflict bodily harm." *Solis*, 216 Ill. App. 3d at 21.

Because the mental states for aggravated battery and attempted murder are not mutually exclusive, *i.e.*, one can intentionally or knowingly cause a victim great bodily harm while at the same time intending to kill the victim, we need not consider whether defendant's

mental state changed from one stab to another. Defendant's convictions for aggravated battery and attempted murder are not legally inconsistent.

## CONVICTIONS BASED ON SAME PHYSICAL ACT OR SEPARATE ACTS

Finally, defendant contends that his aggravated battery conviction and his attempted murder conviction were based on the same physical act, the stabbing of Mr. Leuders. Therefore, defendant contends it was improper to convict him of both crimes, and one of the convictions must be vacated.

Defendant stabbed the victim three times in the back and once in the forearm during a struggle which lasted several minutes. The question is whether each of those stab wounds constitutes a separate act or all of the stab wounds together constitute the same physical act.

The Illinois Supreme Court's decision in *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180, is squarely on point. In *Dixon*, the codefendants repeatedly beat the victim with wooden broom or mop handles. Our supreme court determined, "the separate blows, even though closely related, were not one physical act [citations] and support convictions and concurrent sentences for both aggravated battery and mob action." (*Dixon*, 91 Ill. 2d at 356.) Similarly, in *People v. Wieland* (1984), 123 Ill. App. 3d 576, 462 N.E.2d 1256, repeated punches to the head supported convictions for both murder and aggravated battery. *Wieland*, 123 Ill. App. 3d at 585; see also *People v. Ayala* (1990), 208 Ill. App. 3d 586, 567 N.E. 2d 450 (separate acts where defendant shot victim in abdomen, then in arm with very short interval in between); *People v. Foley* (1990), 206 Ill. App. 3d 709, 718, 565 N.E.2d 39 (where defendant committed three acts of sexual penetration during same encounter, acts were distinct and thus supported convictions of three crimes); *People v. Partee* (1987), 157 Ill. App. 3d 231, 270, 511 N.E.2d 1165 (separate acts where defendant stabbed victim three times around head and neck during struggle).

■ We acknowledge that there are some appellate court cases which support defendant's position that multiple stab wounds should be considered as one physical act. (See, *e.g., People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285 (victim shot twice); *People v. Baity* (1984), 125 Ill. App. 3d 50, 465 N.E.2d 622 (victim shot three times in rapid succession).) However, we must reject the result in those cases because the thrust of the Illinois Supreme Court cases is to consider multiple acts such as the multiple stabs in this case to be separate acts which can support separate verdicts. In *People v.*

*King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, the court wrote, "We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566. Accord *Dixon*, 91 Ill. 2d at 355, 438 N.E.2d at 185; *People v. Segara* (1988), 126 Ill. 2d 70, 76, 533 N.E.2d 802.

Although the parties do not directly address the matter, the question arises whether the aggravated battery is a lesser included offense of the attempted murder. Under the standard set forth in *Blockburger v. United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180, one offense is a lesser included offense only if all of its elements are entirely included in the greater offense. (*Blockburger*, 284 U.S. at 304, 76 L. Ed. at 309, 52 S. Ct. at 182.) Although several Illinois cases, including those cited earlier as supporting defendant's viewpoint, hold that aggravated battery is a lesser included offense of attempted murder (see, *e.g., Washington*, 127 Ill. App. 3d at 389; *People v. Agee* (1990), 205 Ill. App. 3d 146, 152, 562 N.E.2d 545), under the *Blockburger* standard aggravated battery cannot be considered a lesser included offense of attempted murder because all of the elements of aggravated battery are not encompassed in the offense of attempted murder. (See Eisenberg, *Multiple Punishments for the 'Same Offense' in Illinois*, 11 S. Ill. U.L.J. 217, 234-47 (1987) for a discussion of the confusion regarding elements of each offense and proof required in an individual case.) One can cause great bodily harm, an element of aggravated battery, without intending to kill the victim, an element of attempted murder, and *vice versa.*

Moreover, even if aggravated battery could be a lesser included offense of attempted murder when based on the same physical act, such would not be the case where, as here, each offense can be attributed to a separate act. One stab wound can support the attempted murder conviction and another stab wound can support the aggravated battery conviction. When considering the stab wound on which the aggravated battery is based, there is no greater offense based on that stab wound. Therefore, that aggravated battery is not a lesser included offense contained within any greater offense.

*People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196, supports this conclusion. There the defendant argued that he should not have been convicted of criminal sexual assault because it was a lesser included offense of aggravated criminal sexual assault. (*Turner*, 128 Ill. 2d at 575.) Our supreme court found that the numerous acts committed against the victim during the attack supported the convictions for the multiple offenses. (*Turner*, 128 Ill. 2d at 576.) This

conclusion is also implicit in *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477. In that case, defendant shot the victim three times. The defendant was convicted of three counts of aggravated battery and one count of armed violence. (*Donaldson*, 91 Ill. 2d at 170-71.) Our supreme court vacated one of the aggravated battery convictions as a lesser included offense of the armed violence conviction. The three separate shots supported three separate convictions, one for armed violence and two for aggravated battery. *Donaldson*, 91 Ill. 2d at 171.

In *People v. Segara* (1988), 126 Ill. 2d 70, 533 N.E.2d 802, our supreme court, in evaluating its holdings in this area, stated:

"In view of the various decisions, this court concludes that the trend reveals that:

'[I]f a defendant commits more than one criminal act in an episode or transaction, he may be prosecuted for more than one offense unless the charges involve precisely the same physical act. If the physical acts are distinct, the defendant can be convicted of both, but only concurrent sentences can be imposed. If exactly the same physical act does form the basis for more than one offense, a defendant may still be prosecuted for each offense, but only one conviction and sentence may be imposed.' " (*Segara*, 126 Ill. 2d at 76-77, quoting Eisenberg, *Multiple Punishments for the 'Same Offense' in Illinois*, 11 S. Ill. U.L.J. 217, 236-37 (1987).)

The court found that defendant was properly convicted of two counts of aggravated criminal sexual assault where he committed two acts of criminal sexual assault on a child during the same incident. *Segara*, 126 Ill. 2d at 77.

In the present case, defendant stabbed the victim three times in the back and once in the arm while they struggled. Under the supreme court cases cited above, each stabbing must be considered a separate act, just as each strike of a broom handle was a separate act in *Dixon*. (See *Dixon*, 91 Ill. 2d at 356.) Those separate acts support the convictions and concurrent sentences for attempted murder and aggravated battery.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MURRAY and COUSINS, JJ., concur.