THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHERDALE RANDALL, Defendant-Appellant.

First District (3rd Division)   No. 1—95—3650

Opinion filed September 25, 1996.

1020

GALLAGHER, J., concurring in part and dissenting in part.

Epstein, Zaideman & Esrig, P.C., of Chicago (James R. Epstein, Elizabeth A. Kaveny, and David R. Nordwall, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Beligratis, and Patricia Melin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Sherdale Randall (defendant) was convicted by a jury of first degree murder and sentenced to 47 years in prison. On appeal, defendant raises issues as to whether:

(1) the trial court erred in allowing the State to introduce numerous prior consistent statements of three State witnesses;

(2) the State's race-neutral reasons for striking black venire members were sufficient to rebut a *prima facie* showing of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); and

(3) defendant was denied a fair trial when, during opening statements, the prosecutor stated that he represented "you [the jury], the People of the State of Illinois."

Defendant was charged with first degree murder in connection with the shooting death of Michael Anderson (Anderson) on April 6, 1993. Anderson lived in the same neighborhood as the defendant and was known as "Weasel" or "911" because he was thought to be a police informant.

After jury selection, defendant moved the trial court to recognize a *Batson* violation arising from the State's use of four of its seven peremptory challenges to remove blacks from the venire. The trial court found that there had been a *prima facie* showing of discrimination under *Batson*. Following a hearing on defendant's *Batson* motion, the trial court found that the State had provided race-neutral explanations for each of its peremptory challenges and defendant, therefore, had failed to prove purposeful discrimination.

At trial, testimony from officers at the scene indicated that at approximately 10 p.m., Anderson was shot three times in the back with a .45-caliber handgun. There were no eyewitnesses to the shooting and no physical evidence linking defendant to the crime. Defendant was, essentially, found guilty based on the testimony of three State witnesses—Tiffany McMillen, Theresa Strong and Tajuania Jackson.

Tiffany McMillen (McMillen) testified that she was living at 5942 South Ada in Chicago with her roommate, Tajuania Jackson. On the evening of April 6, 1993, McMillen was standing outside her residence when she heard three "shots" fired near her home. Ten seconds later, she observed defendant run past her house carrying a handgun at his side. McMillen relayed her observation to Tajuania Jackson.

On cross-examination, McMillen testified that in April 1994, she went to the office of defendant's lawyer where she gave a statement to defense counsel, which was reduced to writing and signed by McMillen, stating that she could not identify defendant as one of the men who ran past her house or that one man was carrying a gun.

On redirect, McMillen testified, over defense objection, that she told police, an assistant State's Attorney and a grand jury that she observed defendant carrying a gun immediately after hearing the three shots. The trial court allowed this prior consistent statement, finding defense counsel had attempted to establish an inference of recent fabrication through introduction of the statement given counsel in April 1994. McMillen also testified that she was visited 10 to 20 times by members of defendant's family, who encouraged her to give the statement to defendant's lawyer. When asked, McMillen stated that she was "threatened" into giving the statement and was "followed" to the lawyer's office by defendant's cousin and brother.

Tajuania Jackson (Jackson) testified that on the day following the shooting, she approached defendant, with the intent of "playing a

joke on him," and told him that she had seen defendant "running" the night before, to which defendant responded that he had shot Anderson last night but "the motherf——r wouldn't go down."

On cross-examination, Jackson testified that she did not know who had fired the shots, nor did she observe defendant fleeing the scene. She also testified that following the shooting, her boyfriend, Eric McMillen, was taken into custody and questioned in connection with Anderson's murder, but he was released after she told police about defendant's admission.

On redirect, Jackson testified that defendant was already under arrest for Anderson's murder when she volunteered defendant's admission to an assistant State's Attorney.

Theresa Strong (Strong) testified that several days prior to the shooting, she observed defendant and Anderson engaged in conversation. When Strong later asked defendant "what he was doing talking to Anderson," defendant responded that he was attempting to "get Anderson alone" for the purpose of "killing him." Defendant further volunteered that "someone was paying him to do it."

On cross-examination, Strong testified that in April 1994, she too went to defendant's lawyer's office and gave a written statement in which she denied having seen defendant and Anderson engaged in conversation. Strong further stated that she had "lied" to police and the grand jury about defendant's statement that he was being paid to kill Anderson. Strong also testified that she was currently being held in Cook County jail for contempt of court for her failure to appear in court in this matter.

On redirect, Strong acknowledged that she had given police, the State's Attorney and the grand jury testimony to the effect that defendant had admitted his plan to kill Anderson for profit. Strong further testified that she was coerced to give the statement to defense counsel and that she was threatened by defendant's friends and family, two of whom drove her to defense counsel's office and remained outside the door until she had given her statement.

Defense counsel objected to the admission of the "prior consistent statements" of McMillen, Jackson and Strong on hearsay grounds. The trial court overruled these objections and, based in large part on the testimony of these three witnesses, defendant was convicted of Anderson's murder.

■ We first address the trial court's rulings to allow the State to introduce prior consistent statements. Generally, a witness' prior consistent statement is not admissible to corroborate a witness' trial testimony. *People v. Williams*, 147 Ill. 2d 173, 227 (1991); *People v. Clark*, 52 Ill. 2d 374, 389 (1972). However, an exception to this gen-

eral rule exists where prior consistent statements are used to rebut a charge or an inference that a witness is motivated to testify falsely or that a witness' trial testimony is of recent fabrication. *Williams*, 147 Ill. 2d at 227; *People v. Shum*, 117 Ill. 2d 317, 340-41 (1987). In such situations, prior consistent statements are admissible to show that a witness told the same story before any motive to give false testimony came into existence or before the time of the alleged fabrication. *Williams*, 147 Ill. 2d at 227. A trial court's decision as to the admissibility of evidence shall not be disturbed absent an abuse of discretion. *People v. Radovick*, 275 Ill. App. 3d 809, 817 (1995).

■ At trial, McMillen testified to observing defendant run past her house carrying a handgun immediately following the shooting. Defense counsel's cross-examination elicited the fact that in April 1994, she "volunteered" a statement indicating her inability to identify either defendant or a gun. Although defendant's cross-examination did not directly "charge" McMillen with a motive to testify falsely, the inference that her trial testimony was of recent fabrication is clear. Also, the timing element is satisfied, since McMillen's prior statements to the police, assistant State's Attorney and grand jury were made "before the time of the alleged fabrication." Moreover, the fact that McMillen testified to threats and coercion from defendant's camp supports the trial court's ruling to admit. Accordingly, since an inference of recent fabrication was made and McMillen's prior consistent statements were made before the time of the alleged fabrication—literally at trial—the trial court did not abuse its discretion in allowing the prior statements into evidence.

■ Jackson testified that, in response to her goading, defendant admitted shooting and killing Anderson. On cross-examination, defense counsel suggested that Jackson implicated defendant in order to exonerate her boyfriend, who had been questioned in connection with Anderson's murder. Contrary to defendant's argument, there simply is no prior consistent statement issue in Jackson's testimony.

First, the State did not introduce or refer to an earlier statement. Rather, the defense introduced Jackson's statement to the police into evidence (defense exhibit 4) and asked Jackson to read from the statement. This strategy was employed in hope of eliciting that Jackson's statement to the police implicating defendant was given after her boyfriend's arrest, thereby establishing her motive to lie and discrediting her trial testimony. Although the State did not bolster Jackson's trial testimony, it could have since the defense clearly "opened the door" to this issue. Since the State made no reference to a prior consistent statement, no error obtains.

During trial, Strong was held in contempt of court for failure to appear and testify pursuant to the State's subpoena. She was held in Cook County jail for five days before testifying. The State's redirect revealed that Strong had been told "not to go to court" by Monte Moore and Eric Wilkerson, both of whom are members of defendant's family. Moore also drove Strong to defense counsel's office and instructed her to give exculpatory testimony on defendant's behalf. Strong testified to receiving physical threats should she not comply with Moore's instructions.

On cross-examination, defense counsel suggested that Strong's trial testimony implicating defendant was given in order to procure her release from custody. The State sought to introduce Strong's prior consistent statements given to the police, State's Attorney and grand jury. The trial court overruled defendant's hearsay objection, finding, "I think there is an inference out there with the jury that this [Strong's trial testimony] was a recent fabrication so the objection will be overruled." More accurately, however, defense counsel's questioning Strong about her incarceration for contempt suggests a motive to testify falsely—in order to "get out of jail"—and thus the prior consistent statements were properly admitted.

Defendant argues that, even if the trial court was correct to observe an inference of recent fabrication or a motive to testify falsely, Strong's motive to lie arose before the statements were made to police, the State's Attorney and grand jury. If the motive to testify falsely exists before the consistent statements were made, they should not be admitted. *People v. Emerson*, 97 Ill. 2d 487, 501 (1983); *People v. Davis*, 130 Ill. App. 3d 41 (1984).

Defendant argues that Strong's motive to lie arose out of a "fear of incarceration" that preceded her arrest for contempt. The sole support for this contention is found in Strong's statement to defendant's attorney wherein she stated the reason she was untruthful to the police and grand jury "was because she was threatened with incarceration if she did not give the answers the police wanted her to give." Given the coercive nature of Strong's statement to defense counsel, and the rather clear implication of counsel's cross-examination of Strong—that she would "say anything" to avoid more jail time—the prior statements were admissible, and we affirm the trial court's rulings in this regard.

We next examine defendant's contention that the State violated his constitutional rights by using its peremptory challenges to exclude black members of the venire. Defendant contends that the reasons given by the prosecution for its use of four peremptory challenges to exclude black venire members were pretextual and insuf-

ficient to rebut the trial court's finding of a *prima facie* showing of discrimination under *Batson*. The State seeks to minimize this issue by observing that this case involves a black defendant, victim and occurrence witnesses. However, this is not a significant part of the equation.

█ *Batson* provides a three-step process for the evaluation of racial discrimination claims in jury selection. The defendant must first make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. If the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. Third, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24; *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1865-66 (1993).

A race-neutral explanation is one based upon something other than the race of the juror. In assessing the explanation, the focus of the court's inquiry is on the facial validity of the prosecutor's explanation. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866. The reasons given by the State need not rise to the level necessary to justify exclusion for cause, but they must constitute more than a mere denial of discriminatory motive. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24. The prosecutor must give clear and reasonably specific, legitimate, race-neutral reasons related to the particular case. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 106 S. Ct. at 1866. A trial court's finding that the State excused black venire members for race-neutral reasons will not be reversed unless it is clearly erroneous. *People v. Andrews*, 155 Ill. 2d 286, 293-94 (1993).

Having made these observations, we now consider the charade that has become the *Batson* process. The State may provide the trial court with a series of pat race-neutral reasons for exercise of peremptory challenges. Since reviewing courts examine only the record, we wonder if the reasons can be given without a smile. Surely, new prosecutors are given a manual, probably entitled "Handy Race-Neutral Explanations" or "20 Time-Tested Race-Neutral Explanations." It might include: too old,[1] too young, divorced,[2] "long, un-

---

[1]*People v. Smith*, 258 Ill. App. 3d 1003 (1994).
[2]*People v. Kindelan*, 213 Ill. App. 3d 548 (1991).

kempt hair,"[3] free-lance writer, religion,[4] social worker,[5] renter,[6] lack of family contact, attempting to make eye-contact with defendant, "lived in an area consisting predominantly of apartment complexes,"[7] single, over-educated,[8] lack of maturity, improper demeanor,[9] unemployed, improper attire,[10] juror lived alone,[11] misspelled place of employment, living with girlfriend,[12] unemployed spouse, spouse employed as school teacher, employment as part-time barber, friendship with city council member,[13] failure to remove hat,[14] lack of community ties,[15] children same "age bracket" as defendant,[16] deceased father[17] and prospective juror's aunt receiving psychiatric care.[18]

Recent consideration of the *Batson* issue makes us wonder if the rule would be imposed only where the prosecutor states that he does not care to have an African-American on the jury. We are reminded of the musing of Justice Cardozo, "We are not to close our eyes as judges to what we must perceive as men." *People v. Knapp*, 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920).

▉ In the present case, the trial court found that the defendant had made a *prima facie* showing of discrimination and required the State to present race-neutral reasons for its exclusion of four black venire members. The sufficiency of those explanations will be examined below.

(1) Annie Scott

The State gave the following reasons for its exclusion of Ms. Scott:

---

[3]*Purkett v. Elam*, 514 U.S. 102, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995).

[4]*People v. Hope*, 168 Ill. 2d 1 (1995).

[5]*People v. Mitchell*, 152 Ill. 2d 274 (1992).

[6]*Mack v. Illinois*, 493 U.S. 1093, 107 L. Ed. 2d 1072, 110 S. Ct. 1170 (1990).

[7]*People v. Fauntleroy*, 224 Ill. App. 3d 140 (1991).

[8]*People v. Gaston*, 256 Ill. App. 3d 621 (1993).

[9]*People v. Wiley*, 165 Ill. 2d 259 (1995).

[10]*People v. Campbell*, 240 Ill. App. 3d 179 (1994).

[11]*People v. Young*, 128 Ill. 2d 1 (1989).

[12]*People v. Caine*, 258 Ill. App. 3d 599 (1994).

[13]*People v. Harris*, 164 Ill. 2d 322 (1994).

[14]*People v. Williams*, 164 Ill. 2d 1 (1994).

[15]*People v. Morgan*, 142 Ill. 2d 410 (1991).

[16]*People v. Andrews*, 155 Ill. 2d 286 (1993).

[17]*People v. Fair*, 159 Ill. 2d 51 (1994).

[18]*People v. Hudson*, 157 Ill. 2d 401 (1993).

"Judge, she was an employee for the City, her daughter was employed for the City, a retired worker, she had previously been a juror. That's an important factor. She's a juror in which she said it was a civil case but in actuality, when she explained, it was a criminal case, so she didn't know about burdens, an important factor she was a juror before, a burden issue here.

She was a female black, Judge, but again, she did have ties with City employees which you'll notice, Judge, is a recurrent theme through the exclusion of our witnesses. *** I would point out this courtroom is extremely warm, she's an elderly woman, we're worried about her ability physically to be able to sustain the required concentration that would be necessary.

I don't want to state just the age factor itself, it was looking at her and her physical appearance, not a matter of just an old person being on the jury, not that at all, a matter of looking at her, watching her demeanor during the questions that were posed by the Court."

The State's bases for challenging Ms. Scott can be summarized as follows: (1) her inability to recall the difference between the burden of proof in civil and criminal cases; (2) she and her daughter were city employees; and (3) she appeared frail.

Ms. Scott indicated that she had served as a juror in a "child neglect case" where the verdict had been guilty. She further stated that her prior juror experience would not affect her ability to be fair to both sides in the present case. Ms. Scott did not, as the State contends, indicate or imply an inability to differentiate between burdens of proof in civil and criminal cases. Accordingly, we find this reason fails to provide a race-neutral ground for the State's peremptory challenge of Ms. Scott.

Nor do we accept the State's exclusion of Ms. Scott by reason of her or "her daughter's" employment with the City of Chicago. First, we note that the record's only reference to Ms. Scott's employment indicates that she is retired and formerly "worked at a bindery." The record also indicates that Ms. Scott's *son* works for "PACE Transportation." Secondly, even assuming the State were correct as to Ms. Scott's employment status and her "ties to City employees," we fail to perceive how the State's concern regarding employment with a municipality forms a legitimate and race-neutral reason for challenge. The State maintains that "City employees are more liberal." This gross generalization has no relevance to the facts of this particular case. We further observe that defendant's jury contained Mr. Leathers, a retired government employee with two children in similar service, and Ms. Lambert, an employee of the Village of Berwyn. Generally, "the decisive question will be whether counsel's race-

neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869. We do not believe the State's reason and find it is not race-neutral.

We do, however, accept Ms. Scott's "frailty" and the State's concern that her attention would wane as the trial progressed as legitimate reasons for excusing her from the venire. Defendant observes that the State accepted Joseph Denaro, a white juror older than Ms. Scott. Defendant argues that the State's explanation is not race-neutral if the State retains white venire members having the same or similar characteristics and there are no additional characteristics to meaningfully distinguish the white venire members from the black members who were challenged. See *People v. Mack*, 128 Ill. 2d 231, 239 (1989). However, the State's reason for challenge was not age *per se*, but rather the degree of Ms. Scott's fitness. Therefore, the disparity of physical fitness between Ms. Scott and Mr. Denaro, observed by the trial court, provides a meaningful distinction between the two jurors, and no error obtains. See *People v. Lovelady*, 221 Ill. App. 3d 829, 839 (1991) (where a prosecutor does not rely solely on one reason in the explanation of his peremptory challenge, the challenge can be deemed race-neutral on another reason given).

(2) Terry Mays

Ms. Mays was excused because, according to the State, she "was young and an employee of the public library system." The prosecutor reiterated his belief that city employees are "more liberal, especially working in the Chicago Public Library." Defendant notes that the State accepted Clay Ullrick, a white juror who was 24 years old, three years her senior. Again, absent distinguishing characteristics, the State's explanation is not race-neutral if the State retains white venire members having the same or similar characteristics as the excused black venire member. *Mack*, 128 Ill. 2d at 239. The inquiry thus becomes whether there is a meaningful distinction between Ms. Mays and Clay Ullrick.

Although we question the State's proposition that city employment somehow translates into or produces "liberal jurors," a legitimate distinction may be drawn between a librarian and a bartender, Clay Ullrick's chosen profession. Moreover, Ullrick had numerous friends in law enforcement, making him a favorable juror despite his youth and lack of, as the State puts it, "life experience." Thus, we find no error in the trial court's acceptance of the State's reasons as race-neutral.

(3) Margaret Williamson

Ms. Williamson was excluded because (1) she had previously served on a jury; (2) she was a substitute school teacher; and (3) had a nephew with a conviction for armed robbery. Although the State accepted a white teacher, a former juror and a woman whose son had a criminal conviction, Ms. Williamson was a composite and the trial court was within its discretion to accept the State's reasons for her exclusion as race-neutral.

(4) Linda Bond

Ms. Bond was excused because she was a public high school principal and "we [the State] believe Chicago employees who work with students are much more forgiving." This reason has been found to be race-neutral. See *People v. Nunn*, 273 Ill. App. 3d 519, 523 (1995); *People v. Hemphill*, 230 Ill. App. 3d 453 (1992). Defendant observes, however, that the State did not challenge Wesley Smith, a white school teacher from Wilmette, or Stephanie Garrison, a white school teacher who sat on defendant's jury. Moreover, Ms. Bond had other, favorable characteristics, including having been the victim of a crime, having a close friend who was a crime victim and having a friend who was a police officer. Ms. Garrison had a family member who was the victim of a crime. Ms. Garrison also had formerly been a juror.

The State, both at trial and throughout its argument in this court, has identified "favorable" characteristics of potential jurors, including: (1) crime victim; (2) having friends or family who were crime victims; and (3) friendship with police officers. Similarly, the State has identified prior jury experience as a "negative" characteristic.

Ms. Bond and Ms. Garrison, both educators, are distinguished in that Ms. Bond has been a crime victim and has a friend employed as a police officer. Ms. Garrison also has the "negative" characteristic of previous jury service. Since, using the State's own reasoning, these additional or distinguishing factors seem to *favor* Ms. Bond, we are at a loss as to why she, and not Ms. Garrison, was excused. The conclusion that best explains the State's use of a peremptory challenge to excuse Ms. Bond is that the challenge was racially motivated. See *Mack*, 128 Ill. 2d at 239; *People v. McDonald*, 125 Ill. 2d 182, 199 (1988) (The State's explanation for the exclusion of a black venire member cannot be considered race-neutral if the State failed to exclude a white venire member having the same or similar characteristic and there are no further characteristics meaningfully distinguishing the white venire member who was retained from the challenged black venire member). This we cannot excuse in the course of paying homage to the mandates of *Batson*.

Accordingly, since we are unable to find a race-neutral reason for Ms. Bond's dismissal from defendant's jury, we reverse defendant's conviction and grant him a new trial. See *People v. Coleman*, 155 Ill. 2d 507 (1993) (If the State fails to articulate legitimate race-neutral reasons for its peremptory challenge of even one venireperson, then the defendant's conviction must be reversed and a new trial granted); *People v. Washington*, 272 Ill. App. 3d 913 (1995) (State's reason found "pretextual" where other jurors who had male children closer in age to defendant were not similarly excused); *People v. Thornton*, 256 Ill. App. 3d 708 (1993) (explanations that one juror was too old and another unemployed were clearly pretextual and not race-neutral); *People v. Gaston*, 256 Ill. App. 3d 621 (1993) (unemployed status of prospective juror's husband and son pretextual explanations); *People v. Sims*, 249 Ill. App. 3d 246 (1993) (exclusion of two persons because they were employed by United States Postal Service insufficient race-neutral explanation).

For the reasons set forth above, we reverse defendant's conviction and remand for a new trial.

Reversed and remanded.

CERDA, J., concurs.

JUSTICE GALLAGHER,[19] specially concurring in part and dissenting in part:

I respectfully dissent. The trial court's determination of whether the State has a valid, neutral-based reason for its exercise of a peremptory challenge is entitled to "great deference" and should not be disturbed on review unless the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Hernandez v. New York*, 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871 (1991).

A potential juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged. *People v. Benson*, 266 Ill. App. 3d 994, 999, 641 N.E.2d 617, 622 (1994), *appeal denied*, 158 Ill. 2d 554, 645 N.E.2d 1360 (1994).

Here, Ms. Bond is a public high school principal and a renter. There were other educators selected for the jury, but all the excused

---

[19]Justice Rizzi originally heard oral argument in this case prior to his retirement. Justice Gallagher was substituted and has reviewed the record, briefs and audio recording of the oral argument.

potential jurors were renters. "A venireperson may be excluded on a peremptory challenge based on the fact that he rents his home." *People v. Thomas*, 266 Ill. App. 3d 914, 922, 641 N.E.2d 867, 873 (1994), citing *People v. Mack*, 128 Ill. 2d 231, 538 N.E.2d 1107 (1989).

The majority has placed the trial court in an unenviable position. Even though there was a facially valid reason for excluding this juror, the trial court must second-guess the State as to why it did not exclude another person with a negative trait. The majority opinion would require the trial court to second-guess the State as to the best use of its peremptory challenges. Where there are race-neutral reasons for challenging venirepersons, the trial court need go no further and inquire whether there are other persons with more or stronger race-neutral reasons. Yet, the majority herein holds otherwise. The trial court should not have to bear that burden. I accordingly dissent.

I concur with the remainder of the majority's well-reasoned opinion regarding the appropriate admission of prior consistent statements.