******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LAVINE, J., concurring. I agree with the majority's conclusion that in the present case, the peremptory challenge was properly exercised under prevailing law and practices. I especially agree with the observations expressed in footnote 5 of the majority's opinion, including the admonition that trial courts must be particularly diligent in assessing the use of peremptory challenges in cases in which the opportunity for pretextual use of such challenges is present. It is my view, however, that no amount of judicial diligence and oversight can remedy a problem that has become embedded in the *Batson*[1] procedure itself unless that procedure is revised. I write separately because this case brings into sharp relief a serious flaw in the way *Batson* has been, and can be, applied. *Batson* is designed to prevent lawyers from peremptorily challenging prospective jurors for manifestly improper reasons based on race, national origin, and the like. It was *not* designed to permit prosecutors—and other lawyers—to challenge members of suspect classes solely because they hold widely shared beliefs within the prospective juror's community that are based on life experiences. This flaw is in plain sight for all to see and must be remedied if the jury selection process is to attain the goal of producing juries representing all of the communities in our state and gaining their confidence and trust. I believe a blatant flaw that significantly disadvantages black defendants[2]—and people belonging to other suspect classes—has become part of the *Batson* process itself. I conclude that Connecticut should reform its jury selection process to eliminate the perverse way in which *Batson* has come to be used. I put forth a suggestion that, I hope, will prompt discussion.

In the present case, the prospective juror, W.T., a social worker and a volunteer for the Department of Correction, was asked if he had had any interactions with the police in which he had developed either a strong or unfavorable impression of the police or of the way in which he was treated by the police in any situation. He responded by stating that based on his experiences growing up in this society, he fears for his life. He stated that he sometimes is concerned when he sees a police car behind him when he is driving and wonders if he's going to be stopped. He further stated that he has family members who had spent time in jail, but that he would not be influenced by that fact. In addition, he noted that, based on his experiences working with inmates, he is aware of issues within the American criminal justice system, such as the fact that African-Americans represent a disproportionate number of inmates in jail.[3] He stated, however, that he could be fair and would have no trouble following the court's instructions.

Notwithstanding the concerns I express here, I think that, under the present regime, there was at least an arguable basis to conclude that W.T. could not be fair. In light of all of his views considered together, not having been in the courtroom to personally observe W.T., and taking the prosecutor at his word, I am unable to conclude that the use of a peremptory challenge was pretextual.

Acknowledging that there is a diversity of opinion within every community, however, W.T.'s views appear to me to be by no means radical or unreasonable. On the contrary, they appear to be logical, fact-based, and understandable in light of the troubling—to use a euphemism—history of relations between minority communities, on the one hand, and the police and criminal justice system, on the other. They are particularly understandable in light of the many shootings of young black men by police around the country in recent years. One need not share W.T.'s beliefs in every respect to believe them to be rational and widely held in his community. Yet, under *Batson*, W.T.'s understandable beliefs provide a basis for the proper use of a peremptory challenge given the way *Batson* is presently administered.

Justice Marshall noted in his concurring opinion in *Batson* that "defendants cannot attack the discriminatory use of peremptory challenges at all unless the challenges are . . . flagrant . . . . A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such as an explanation as well supported." (Citations omitted.) *Batson* v. *Kentucky*, 476 U.S. 79, 105–106, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Indeed, disingenuous explanations for the use of peremptory challenges against various categories of prospective jurors abound in the case law.[4] Justice Marshall himself urged the total elimination of all peremptory challenges. Id., 107. Judge Mark W. Bennett, a United States District Court judge in the Northern District of Iowa, shares that view and has written that "[b]ecause *Batson*'s framework is flawed, it has produced the lingering and tragic legacy that the courts always *do not* find purposeful discrimination, regardless of how outrageous the asserted race-neutral reasons are." (Emphasis in original.) M. Bennett, "Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of *Batson*, and Proposed Solutions," 4 Harv. L. & Policy Rev. 149, 161 (2010).

The reality is that "[u]nder [the] current *Batson* doctrine, the trial court cannot reject a peremptory challenge unless it makes a finding of attorney misconduct

that has at least two facets, either of which would give any reasonable trial judge pause. First, the judge must make a factual finding that the race- or gender-neutral explanation proffered by the striking attorney at *Batson*'s second step is not, in fact, the reason for the strike but is instead 'pretextual . . . .' In other words, the court must find that the attorney has made a misrepresentation to the court of a material fact—a serious breach of the attorney's ethical duty of candor. Second and relatedly, the judge must find that the attorney exercised a peremptory challenge based on race or gender and accordingly violated the juror's constitutional right to equal protection under the law. Indeed, considered together, a trial court ruling in favor of a *Batson* movant constitutes a judicial determination that an attorney, in open court, engaged in a misrepresentation of a material fact to obscure a violation of the law—an action that, in other contexts, could warrant criminal prosecution. . . . Given the implications of the findings required to establish a *Batson* violation, it is understandable that in all but the most extreme cases, trial courts will err on the side of crediting the reason proffered for a strike." (Footnotes omitted.) J. Bellin & J. Semitsu, "Widening *Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney," 96 Cornell L. Rev. 1075, 1113–14 (2011). Put simply, judges are reluctant to find that a prosecutor's stated reasons are based on conscious, or unconscious, racist beliefs or assumptions.[5]

The problem presented by this case, then, must be viewed in the context of the generally ineffectual application of *Batson*.

Where does that leave things? What is to be the fate of the hypothetical black prospective juror who testifies under oath that he can be fair to both the state and the defense, but also indicates that he has concerns because he has been stopped, for no apparent, valid reason, while driving? Or because members of his family have been jailed? What about the hypothetical female prospective juror, who is being questioned in a criminal sex assault case, who swears that she can be fair to the state and the defendant, but who has formed the opinion that police sometimes do not treat the victims of sexual assault with all the seriousness and dignity to which they are entitled? Or the hypothetical Japanese-American prospective juror, in a civil case in which a federal employee is the plaintiff, who swears he or she could be fair to both sides, but who recounts his or her family's suffering at the hands of the federal government when subject to internment during World War II?

There are two things fundamentally wrong with a system that permits someone with the rational and fact-based views of these hypothetical prospective jurors to be peremptorily challenged and excluded from jury service.

First, permitting someone with the stated beliefs of these hypothetical prospective jurors to be excluded from jury service is an affront to the community with which he or she identifies and undermines the claim of the jury selection system to be fairly representative of all segments of our diverse society. The reality is that permitting the use of peremptory challenges under these circumstances *effectively excludes a significant number of people belonging to suspect classes from jury service. Batson*, as it has evolved, permits the elimination of certain categories of prospective jurors whose views are reasonable and widely shared in their communities. The potential for the kind of categorical exclusion that *Batson* permits is simply unacceptable in a system that strives to treat everyone equally. It sends a troubling message to members of minority communities who should be encouraged—not discouraged—to actively engage in, and trust, the criminal justice system.

Second, permitting a peremptory challenge to be used under these circumstances is an affront to the dignity of the individual prospective juror who is excluded for honestly voicing reasonable and widely held views. It minimizes or negates his or her life experience in an insulting and degrading way. It must be remembered that one of the rationales for *Batson* is that the inappropriate exclusion of prospective jurors deprives the *prospective juror* of his or her constitutional right to serve on a jury—a basic right of citizenship. See *Batson* v. *Kentucky*, supra, 476 U.S. 87. To prohibit a significant percentage of people belonging to a suspect class from serving on a jury because they express a reasonable, fact-based, and widely held view cannot be countenanced. As Justice Powell, writing for the court, stated in *Batson*, "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." Id. Moreover, if members of a suspect class are punished for honestly voicing their widely shared views; for example, they are concerned when they see a police car behind them when they are driving because they fear being stopped for no valid reason;[6] the present regime creates an incentive for them to give dishonest or deceitful answers, rather than honest ones. This, in and of itself, undermines a fair jury selection system, which relies on prospective jurors honestly answering the questions put to them.

It is true, of course, that peremptory challenges play an important function in our system because they permit lawyers to use their intuition in the very human jury selection process. Lawyers should have the opportunity to look prospective jurors in the eye, size them up, and evaluate their answers. This is a time-honored and important practice. However, as Justice Marshall noted in his concurring opinion in *Batson*, "the right

of peremptory challenge is not of constitutional magnitude, and may be withheld altogether without impairing the constitutional guarantee of impartial jury and fair trial." Id., 108. When the use of a peremptory challenge, in cases similar to the present one, has the potential to exclude categorically large swaths of people within a suspect class, the price the system pays for maintaining that practice is too high.

This problem cannot be solved simply by urging restraint upon the lawyers selecting a jury. Their job, after all, is to win their clients' cases by selecting a jury most likely to return a verdict in their favor. The player in the system with the responsibility for ensuring that prospective jurors belonging to suspect classes are properly treated so that the system is fair, and is perceived as fair, is the judge. Our judges are tasked with making many difficult and sensitive decisions in a wide variety of contexts. Our judges decide which parent a child should live with in highly contested divorce cases; and decide what sort of a sentence to mete out when serious violent crimes are committed; and decide whether and how much punitive damages should be awarded in bitter business disputes. And judges already determine whether a prospective juror should be excused for cause. Our judges can be trusted to administer the jury selection process so as to protect all of the important societal interests involved, not only those of the state and the defendant.

I understand Connecticut's deep and long-standing attachment to the individual *voir dire*.[7] Therefore, I suggest an alteration in the way *Batson* is administered in Connecticut to ameliorate the negative effects of the present regime. I would remove some of the discretion from the lawyers selecting a jury and reallocate it to the judge supervising the process. I believe the flaw illustrated by cases of this sort could be ameliorated substantially if judges are given the discretion to disallow the use of peremptory challenges in cases in which: (1) the prospective juror is part of a suspect class; (2) the prospective juror gives an unequivocal assurance, under oath, that he or she can be fair to both sides; (3) the prospective juror expresses reasonable and fact-based views, which, in the opinion of the judge, following argument by the lawyers, are widely shared in the prospective juror's particular community; and (4) the judge concludes that the prospective juror can, in fact, be fair.

The application of this proposed test would tend to ensure that a peremptory challenge could not exclude the previously discussed hypothetical jurors. Suppose, however, that one of these prospective jurors testifies that he or she distrusts the criminal justice system because he or she heard someone on "talk radio" criticize it. In this instance, the judge would permit the exercise of a peremptory challenge because the pro-

spective juror's views, in part, would not be reasonable and based on the potential juror's life experience.

I acknowledge that this approach would deprive lawyers of some degree of discretion in their use of peremptory challenges and would transfer that discretion to the judge. But I believe this reallocation of discretion from lawyers picking juries, to judges supervising the process, is needed. As cases raising these issues illustrate, the price society pays by permitting prospective jurors, like W.T., to be excluded is unacceptably high. The justice system has an obligation to do everything it can to encourage participation by all segments of society, particularly those who have grown understandably suspicious of that system. I can think of no better way to accomplish this than by trusting our judges to monitor this process, keeping well in mind the lamentable history of racial discrimination that has afflicted African-American communities and other people belonging to suspect classes. The *Batson* problem discussed here deserves study in the interest of ensuring that Connecticut juries are fairly composed of representatives from the many diverse groups that make up our great state.

[1] See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] Many reported *Batson* cases arise from criminal cases in which the prospective juror struck was African-American, and the party exercising the challenge is a prosecutor. However, *Batson* is applicable in civil and criminal cases, irrespective of which party is seeking to exercise a peremptory challenge against someone from a suspect class. While *Batson* itself primarily discusses issues relating to African-American prospective jurors, it applies as well to other suspect classes and categories of people. For simplicity, I will use the phrase "suspect class" throughout this opinion.

[3] The problem of over-incarceration of African-American males has been the subject of much discussion and debate in recent years. See, e.g., M. Alexander, The New Jim Crow: Mass Incarceration in the Age of Colorblindness (2012). Studies indicate that the percentage of black men in prison is disproportionately higher than the percentage of black men in the general population. The September, 2014 bulletin of the United States Department of Justice, Bureau of Justice Statistics, indicates that as of December 31, 2013, of 1,516,879 sentenced prisoners under the jurisdiction of state or federal correction authorities, 526,000 were black men; 454,100 were white men; and 314,600 were Hispanic men. E. Carson, "Prisoners in 2013," (September 2014), p. 8, Bureau of Justice Statistics, United States Department of Justice, available at https://www.bjs.gov/content/pub/pdf/p13.pdf (last visited August 30, 2017).

[4] In *People* v. *Randall*, 283 Ill. App. 3d 1019, 1025–26, 671 N.E.2d 60 (1996), former Justice Alan J. Greiman, the author of the majority opinion, offered a harsh appraisal of the ease with which *Batson* could be subverted through disingenuous explanations for the use of a peremptory challenge. He stated: "Having made these observations, we now consider the charade that has become the *Batson* process. The State may provide the trial court with a series of pat race-neutral reasons for exercise of peremptory challenges. Since reviewing courts examine only the record, we wonder if the reasons can be given without a smile. Surely, new prosecutors are given a manual, probably entitled, 'Handy Race-Neutral Explanations' or '20 Time-Tested Race-Neutral Explanations.' " Id.

For a discussion of some of the "almost laughable" race neutral reasons some prosecutors have proffered, and courts have accepted, see J. Bellin & J. Semitsu, "Widening *Batson*'s Net to Ensnare More than the Unapologetically Bigoted or Painfully Unimaginative Attorney," 96 Cornell L. Rev. 1075, 1093 (2011). In truth, decisions in jury selection—as in other areas of life—are often influenced by the sometimes very subtle implicit biases we all carry with us. See, e.g., M. Bennett, "Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed

Promise of *Batson*, and Proposed Solutions," 4 Harv. L. & Policy Rev. 149, 161 (2010); J. Kang, "Implicit Bias—A Primer for Courts," National Center St. Cts., (August 2009), available at http://wp.jerrykang.net.s110363.gridserver.com/wp-content/uploads/2010/10/kang-Implicit-Bias-Primer-for-courts-09.pdf (last visited August 30, 2017).

[5] Chief Justice Warren E. Burger, in his dissenting opinion in *Batson*, points out that permitting lawyers to use their intuition to excuse certain prospective jurors can redound to the benefit of members of suspect classes. He posits an example in which an Asian defendant is on trial for the murder of a white victim and the prospective jurors, all white, deny harboring racial prejudice. The defendant, however, continues to harbor a hunch, an assumption, or an intuitive judgment that these white prospective jurors will be unfair to him due to racial biases. The ability of the defendant to use peremptory challenges without need for explanation can protect that defendant, notes Burger. See *Batson* v. *Kentucky*, supra, 476 U.S. 128.

[6] Connecticut law requires the maintenance of records by police departments so authorities can annually track the nature and extent of racial profiling of black drivers. Annual reports indicate that there are racial and ethnic disparities in the traffic stop patterns of various police departments. A. Ba Tran, "Digging Deeper Into Racial Disparities in Connecticut Traffic Stops," TrendCt.org, (June 14, 2016), available at http://trafficstops.trendct.org/story/digging-deeper-into-racial-disparities-in-ct-traffic-stops/ (last visited August 30, 2017). Connecticut police officials have claimed that independent reviews have demonstrated that reports that minority drivers are stopped disproportionately are flawed. D. Collins, "Connecticut Chiefs Say Police Profiling Reports are Flawed," Associated Press, May 4, 2017, available at https://www.usnews.com/news/best-states/connecticut/articles/2017-05-04/connecticut-chiefs-say-police-profiling-reports-are-flawed (last visited August 30, 2017).

Still, the ubiquitous stopping of black drivers—particularly black males—is widely recognized. See F. Weatherspoon, "Racial Profiling of African-American Males: Stopped, Searched, and Stripped of Constitutional Protection," 38 J. Marshall L. Rev. 439 (2004). Professor Weatherspoon cites a study undertaken by the Washington Post and the Black America's Political Action Committee, which determined that "approximately forty-six percent of African-American males registered to vote believe they had been stopped by law enforcement officers on the basis of their race." Id., 444 n.25; see also D. Harris, "The Stories, the Statistics and the Law: Why 'Driving While Black' Matters," 84 Minn. L. Rev. 265, 298 (1999) ("Racially targeted traffic stops cause deep cynicism among blacks about the fairness and legitimacy of law enforcement and courts. . . . Thus, it is no wonder that blacks view the criminal justice system in totally different terms than whites do. They have completely different experiences within the system than whites have, so they do not hold the same beliefs about it.").

[7] A recent article in the Connecticut Law Review concludes that abolition of the peremptory challenge is the only way to remedy problems posed by *Batson*. See N. Marder, "*Foster v. Chapman*: A Missed Opportunity for *Batson* and the Peremptory Challenge," 49 Conn. L. Rev. 1137, 1185 (May 2017).

——————————————