THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BENJAMIN VALENTINE, Defendant-Appellant.

First District (5th Division)   No. 1—89—3495

Opinion filed November 15, 1991.—Rehearing denied December 19, 1991.

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Maureen A. Harton, Special Assistant State's Attorney, and Renee G. Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant Benjamin Valentine (Valentine) was found guilty of aggravated criminal sexual assault, attempted criminal sexual assault and home invasion (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14, 8—4, 12—13, 12—11) and sentenced to concurrent terms of 55 years, 25 years and 7 years, respectively. He now appeals, alleging as error the following: (1) The prosecutor's violation of the so-called *Batson* rule (see *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712), (2) the trial court's refusal to instruct the jury on voluntary and involuntary intoxication, and (3) the ineffective assistance of counsel at sentencing. For reasons that shall be discussed, we affirm defendant's conviction and sentence.

It has become rather commonplace for the *Batson* error to be alleged in Cook County appeals. This situation is disturbing because it appears to reflect a dismaying lack of understanding of the tenets of the *Batson* decision and its progeny.

In *Batson v. Kentucky* the United States Supreme Court held that it was an error of constitutional dimension for prosecutors to utilize peremptory challenges to exclude one or more otherwise qualified and unbiased venirepersons based solely on race. The rationale for the rule is threefold, that purposeful discrimination in the selection of the venire (1) violates the defendant's constitutional right to a trial by his peers, (2) violates the prospective juror's right to participate in jury service, and (3) damages the community at large by undermining public confidence in the fairness of our system of justice. See *Batson*, 476 U.S. at 87-88, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718; see also *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364.

Because racial discrimination sanctioned by State action is unacceptable, we must be vigilant lest our legal system be manipulated to

allow for tacit approval of such practice. Recognizing this, the *Batson* court attempted to find a method whereby racial discrimination in the jury selection process could be eradicated, while at the same time, the State's historical privilege of exercising peremptory challenges could survive. To accomplish this goal, the *Batson* court made it encumbent upon trial courts to give meaningful and thoughtful consideration to the matter whenever a defendant objects to the prosecutor's use of peremptories alleging that discrimination motivated the challenges.

A step-by-step process for analyzing such claims was suggested. According to *Batson*, the defendant would first be required to make a *prima facie* showing that the prosecutor utilized peremptory challenges in a purposefully discriminatory manner. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 412, 539 N.E.2d 1172.) Although it is no longer necessary that the defendant show that the State used peremptory challenges to remove from the venire persons who are of the defendant's race, it is necessary for the defense to come forth with relevant circumstances that tend to support a finding that discrimination was the reason that a juror was challenged. *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364; *People v. Edwards* (1991), 144 Ill. 2d 108.

If the trial court determines that a *prima facie* showing has been established, the prosecutor must provide the rationale for having challenged the prospective juror or jurors for whom the defense has raised a question. Then the trial court must assess these explanations to determine whether they are legitimate, race-neutral, case-specific reasons which rebut the inference of discrimination or if they are merely pretextual. If, after considering all the relevant circumstances, including the explanations, an inference of racial discrimination persists, a mistrial must be declared and a new jury selected.

However, this entire process need not be a mechanical one. The overriding concern is to ensure that jury selection is not tainted by racially motivated discrimination and that the defendant is tried by a fair and impartial jury of his peers. (*Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) In the recent *Hernandez* decision, the Court held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at ___, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.

The *Hernandez* opinion clarified the *Batson* directive and reminded both trial courts and courts of review that the focus should be

on the ultimate issue of whether discrimination appears evident. The *Hernandez* court also reinforced the idea that " 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact,' " but that " '[p]roof of racially discriminatory intent or purpose is required.' " *Hernandez*, 500 U.S. at ____, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866, quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977), 429 U.S. 252, 264-65, 50 L. Ed. 2d 450, 464, 97 S. Ct. 555, 563.

Finally, a trial judge's findings, because they constitute a credibility determination, should be given great deference. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; *People v. Harris* (1989), 129 Ill. 2d 123, 175, 544 N.E.2d 357.) Courts of review should not make an independent review of a trial court's rejection of a *Batson* claim, but rather, should only overturn a trial court's finding on the issue of discrimination if it finds the decision to be clearly erroneous. (*People v. Johnson* (1991), 218 Ill. App. 3d 967.) If, however, a reviewing court should find that peremptory challenges were used in a discriminatory manner, it is an error which may not be deemed harmless and reversal is required.

Keeping these standards in mind, we now turn our attention to the jury selection that occurred in this case.

The trial court was provided with a pool of 50 prospective venirepersons. Initially, the trial judge addressed the entire venire in a separate room, informing them of the charges against defendant, the names of persons involved and possible witnesses, as well as general principles of law. The names of 12 persons were then randomly selected, and these persons were brought to the courtroom for *voir dire.*

It is important to note that the trial court conducted the entire *voir dire.* As each venireperson was questioned, if any attorney had a follow-up or clarifying question for a particular venireperson, the attorney was required to approach the bench for a sidebar, relay the proposed question to the court, and the court would decide whether the question would be put to the venireperson.

Jurors were selected in panels of four. That is, the trial court called one venireperson, questioned him or her, and then decided contemporaneously, based upon that individual's answers to the various questions, whether he or she should be excused for cause. The court then moved on to the next venireperson. Once the court interviewed, and found qualified, four venirepersons, the panel was tendered to the parties, but not for further questioning. The State and defense were only asked whether they wished to exercise any peremptories. If so,

those individuals would be excused. Other venirepersons would then be called one by one, and interviewed, until a group of four venirepersons was again compiled, tendered to the parties, and found acceptable by all. Once a panel of four venirepersons was accepted, the members were sworn in as jurors and then excused for the remainder of the day. The court then proceeded with *voir dire* until another panel of four was selected. This process was followed until 12 jurors (three panels of four) and two alternates were selected.

Although the racial make-up of the venire is unknown, the record indicates that the court excused for cause, without objection by either side, two black[1] males, three white males, one black female and three white females. The defense peremptorily challenged two white males and three white females and the State peremptorily challenged two black females. The jury that was accepted consisted of two black males, four white males, one black female and five white females and the alternates were both white, one male and one female.

Valentine, who is black, raised a *Batson* objection after the State exercised its second peremptory challenge. Defense counsel indicated that the objection was interposed at this point because "the reading of the [*Batson*] case said it was proper only after the second." The only basis for the objection was that the State had exercised two peremptory challenges against black venirepersons. Defense counsel acknowledged, however, that the State had already accepted two black venirepersons on the jury. Without assessing the defense objection or determining whether a *prima facie* case had been set forth, the trial court asked the State to respond and the State did so, giving reasons for excusing the two persons.

Although the *Hernandez* decision states that the preliminary issue of whether the defendant set forth a *prima facie* case becomes moot once the State is asked to provide its rationale for excusing certain prospective jurors, we feel compelled to comment on the failure of trial courts to make an initial assessment. This practice of "collaps-

---

[1]Prospective jurors are not required to reveal their race and/or ethnic origins. Therefore, this information is not available or readily ascertainable. The statistics quoted by this court concerning the racial make-up of the jurors and the persons that were excused, either for cause or because of the exercise of peremptories, were placed on the record by defense counsel at the close of jury selection, and this court shall assume them to be correct. The terms "black" and "white" were used by defense counsel and shall be adopted here merely for purposes of argument. We further assume that the term "black" was used to describe those persons who appeared to be of Afro-American descent, while the term "white" was used to describe those persons who did not appear to be of Afro-American descent.

ing" the *Batson* steps, as well as trial courts' failure to make detailed findings of fact to clarify the record when the *Batson* objection is raised, needlessly adds to the number of costly appeals. The State's use of peremptory challenges, although subject to close scrutiny, should not be unnecessarily restricted and the State should not be called upon to reveal its rationale for eliminating certain prospective jurors, or have that rationale questioned, unless the defense is able to articulate, in clear and reasonable terms, the circumstances that led it to believe that race motivated the challenges. This was not done in this case. Nonetheless, since the State was asked to provide reasons for excusing the two prospective jurors and the reasons appear on the record, we shall evaluate those reasons in the context of the entire jury selection procedure and circumstances to determine whether we find that a discriminatory purpose or intent was evident in the jury selection in this case.

■ Our review of the record shows that the second juror challenged by the State was the 26th person called from the venire. She informed the court that she had been married for 37 years, had a 28-year-old daughter and a 27-year-old son, and had worked as a teacher's aide for the Chicago Board of Education for 20 years. She indicated that she had "a lot of friends" who served as police officers and that, as a result of her relationships with these persons, she was "not sure" whether her evaluation of a police officer's testimony would be affected. She further stated that her home had been broken into at one time and she believed that a police officer knew the whereabouts of her stolen merchandise but did not return it to her. This, she indicated, left her somewhat disillusioned regarding police officers, "it kind of gave me a downslide."

The State, when responding to the *Batson* claim, noted the fact that this venireperson had worked with children through the school system for a number of years and that this fact might make her more sympathetic to the defendant, who had been only 19 at the time the offenses were committed. The State also noted the venireperson's stated bias concerning police officers.

The first venireperson peremptorily challenged by the State, whose dismissal from the jury was not objected to at the time because of defense counsel's misconception concerning the *Batson* decision, was the fifth venireperson to be called. She informed the court that she had a daughter and lived at home with her mother, stepfather, sister and brother. She was unemployed and when asked what work or profession she had previously engaged in, if any, she stated "baby-sitting, helping the elderly."

The State, in response to the subsequent *Batson* objection, stated that this venireperson, although 28 years old, had apparently never been employed. The State further indicated that the venireperson's demeanor led it to believe that she was somewhat "mentally slow" or that she had a "dull personality" and would be unable to follow the case carefully.

Valentine did not, nor does he now, dispute any of the State's comments regarding these two venirepersons or argue that they were pretextual explanations. He merely argues that the State did not seek to have these venirepersons excused for cause and so they are, somehow, insufficient reasons. However, the reason given for exercising a peremptory challenge need not rise to the level of a challenge for cause. (*Batson v. Kentucky*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Therefore, the fact that the State did not seek a venireperson's excusal for cause prior to exercising a peremptory challenge should not be dispositive.

We note, too, that defendant does not contend that he was not tried by a jury of his peers as required by the constitution, but rather, focuses mainly on the fact that the court did not follow a methodical step-by-step procedure when assessing the *Batson* claim. However, as stated earlier, the procedure followed need not concern us if the relevant circumstances appear in the record so that the reviewing court can determine whether racial discrimination was evident in the jury selection process.

We find that the record is sufficient in this case and that it supports the trial court's ruling that no *Batson* error was shown. A discriminatory intent was not inherent in the prosecutor's stated explanations nor did the State's use of peremptory challenges, in the context of the entire jury selection process and relevant circumstances, evidence a concerted effort to purposefully exclude Afro-Americans from the jury. There was nothing, other than the shared race of the two venirepersons excused, to indicate that the elimination of these prospective jurors was anything but a legitimate exercise of the State's right to utilize its peremptory challenges. Furthermore, the record provides some basis for the State's belief that the persons they excused were either biased or unqualified for reasons that did not stem from race.

The next issue raised by Valentine is that the trial court erred by refusing to instruct the jury on the defenses of voluntary and involuntary intoxication. Since a trial court has the discretion to refuse to tender a defense instruction on intoxication where there is insufficient evidence from which a jury could reasonably find that a defendant

was so intoxicated at the time of the offense that he lacked the requisite mental state for the crime (*People v. Arnold* (1984), 104 Ill. 2d 209, 470 N.E.2d 981), consideration of this point requires a recitation of the sordid facts of the case. Although the public defenders used the names of the victims in their briefs, we shall abide by the convention recommended in cases of this nature by the committee on gender bias and not reveal the names of the victims.

On the evening of December 19, 1987, C.O. and her two children, a 10-year-old son, T.O., and a 12-year-old daughter, K.O., attended a church service and dinner. After they returned home to their apartment in Calumet City, K.O. fell asleep in the living room watching television and T.O. went to sleep in his mother's bed.

At some point during the night K.O. was awakened by a noise coming from the area near the sliding glass door that led to the balcony of their second-floor apartment. K.O. sat up and turned on a light near where she was sleeping. She then got up to look around the room and was surprised to find a man crouching behind a couch in the room. K.O. asked him who he was and what he wanted. The man, later identified as Valentine, stated that he was the devil and was there to kill them. K.O. then ran to her mother's room.

K.O. awakened her mother, C.O., and told her that there was a man in the apartment. As C.O. awoke she saw defendant enter her room and stand at the foot of the bed. Valentine stated that he was the devil, sent by God to kill them. He then jumped on the bed and began to fondle C.O.'s breasts and genital area. C.O. begged him not to rape her in front of the children and told him that she would give him money or whatever he wanted. In response he told the children to leave the room and then escorted them from the room, turning off lights in the apartment as he led them toward a back bedroom.

When Valentine left the room, C.O. ran from the bedroom and attempted to escape the apartment. But just as she opened the front door, Valentine grabbed her hair from behind. C.O. struggled with Valentine and together they fell down into the outer hallway and down a flight of stairs. They continued to struggle on the floor of the main foyer and then fell down the flight of stairs that led to the building's garden apartment. C.O. screamed for help and clung to a wrought iron banister as Valentine hit and kicked her and tried to drag her back upstairs.

Eventually, Valentine abandoned his efforts with C.O. and ran back upstairs. C.O. followed but found that Valentine had locked himself into her apartment. C.O. then ran outside and began screaming for help. She ran to the next apartment building and began pushing

all the doorbells or buzzers. Soon thereafter a police officer arrived and she informed him that there was a man in her apartment and that he was going to kill her children.

Inside the apartment, Valentine found K.O. and T.O. inside K.O.'s bedroom. He threatened to kill T.O. if he moved or made a sound and then led K.O. out into the family room where he partially disrobed her. Valentine was completely undressed as well. He then led her to another bedroom and began to have sexual intercourse with her.

As Valentine assaulted K.O., she could hear people knocking at the door, the doorbell ringing and the phone ring. Valentine left the room briefly, but upon his return he resumed his sexual assault on her. Eventually, however, police officers entered the room and pulled Valentine off of her.

Police officers Guglio, McCarthy and Thomas all testified at trial. Officer Guglio stated that he and another officer entered the apartment building from the rear and attempted to enter the apartment, but found the door locked. He remained positioned near this door while the other officer returned to the front of the apartment building. As Officer Guglio waited, a black man, later identified as defendant, opened an apartment door and stuck his head out. Guglio identified himself as a police officer and told the man to come out. Defendant just said, "huh" and then closed the door. When additional officers arrived, they tried the door and found it to be unlocked. They entered the apartment and first found T.O. in a back bedroom. They proceeded through the apartment and ultimately found Valentine and K.O. in another bedroom.

When the police officers entered the room Valentine was still engaged in intercourse with K.O. Although three officers attempted to pull Valentine from K.O., he wrapped his arms around her and refused to let go. An officer had to resort to striking Valentine on the head with his service revolver before Valentine would release her. Valentine received a small laceration to the head as a result.

K.O. was removed to safety while Valentine, who was kicking and struggling, was handcuffed. Once Valentine was subdued, Officer McCarthy questioned him. Valentine was able to give his name and address and he then told the officers that they could not arrest him because his father was a Chicago police officer.

C.O., K.O. and T.O., as well as Officers Guglio, McCarthy, and Thomas, all testified that they never detected the smell of alcohol on Valentine. Additionally, the officers testified that, because of their experience and training as police officers, they learned about and had considerable experience in dealing with people who were intoxicated

and/or under the influence of drugs. The officers testified that Valentine did not appear to be under the influence of alcohol or other drugs. Valentine was able to walk to the police car, unassisted, without staggering, stumbling or falling. He spoke coherently, without slurring his speech or mumbling words and his eyes appeared normal.

The only person who detected any smell of alcohol on Valentine was Nurse Couch at Ingalls Hospital, where Valentine was taken by the police to have his head laceration examined. Nurse Couch's hospital report also indicated that Valentine told her at some point that he had consumed alcohol, "reefer" and hash. However, she qualified her testimony by explaining that she is very sensitive to the smell of alcohol and can often detect it when others do not. She also testified that although Valentine was verbally abusive during his stay in the emergency room and refused to cooperate, he knew who he was and seemed generally oriented as to time and place.

It is also noteworthy that C.O. testified that on two occasions prior to December 20, 1987, she had seen Valentine at her apartment building. On the first occasion Valentine rang her doorbell and attempted to gain entry into the building, asking about an upstairs resident. When C.O. left the building Valentine was still outside and he entered the building as she left. On the second occasion Valentine was already inside the building and he knocked at C.O.'s front door. He asked C.O. for some paper and a pencil, ostensibly so he could write a note to another resident. C.O. saw Valentine through the "peep hole" in her door, but did not open the door.

Valentine's only proffered defense was his alleged chemical abuse. In furtherance of this defense, Valentine produced one witness, Arlon McClendon, who testified that he had been with Valentine on the evening of December 19, 1987. McClendon claimed that on the night of December 19, 1987, he met Valentine at a Burger King around 7 p.m. and then drove him and two other friends to a party that was to take place at a motel room near 159th and Harlem. He stated that they brought one case of beer and a half gallon of gin with them for the party.

At the motel, too many people showed up, so the proprietor of the motel asked them to leave. Upon leaving the motel, about eight people, including Valentine and McClendon, went to a friend's house to continue partying. At this house they ate pizza and another case of beer was purchased. In addition, McClendon claimed that a few people, including Valentine, "tooted" some cocaine and that "everyone" shared two "joints" of marijuana. He claimed that he himself did not smoke the marijuana because he believed that the joints smelled as if

they were "sherm sticks," *i.e.*, laced with PCP, a hallucinogenic drug. However, he admitted that no one ever told him that the marijuana contained PCP.

McClendon further testified that Valentine got into an argument during the party and was told to go into the other room to "cool down." Later, when they rejoined Valentine, they "teased" him about not being able to hold his liquor. Valentine became upset because they were teasing him and decided to go outside for some fresh air. After a while they went outside and brought Valentine back in; however, when they started teasing him again, Valentine got up, got his coat, and went outside to sit on the porch. Twenty minutes later they went outside and found that Valentine was gone.

McClendon admitted that he had never come forward prior to trial to inform anyone that he had been with Valentine at a party on the night prior to the incident that was the subject of the trial. In fact, he contacted defense counsel the very same day that he testified, nearly two years after the fact. Furthermore, McClendon admitted that he could not say with certainty how much, or what, Valentine had to drink.

■ Based upon all the evidence presented, we find that the trial court did not abuse its discretion in ruling that there was insufficient evidence from which a reasonable jury could find that Valentine was intoxicated to the extent necessary to suspend his ability to form the requisite intent. Valentine was not entitled to have the jury instructed on the defenses of voluntary or involuntary intoxication. See *People v. Arnold*, 104 Ill. 2d 209, 470 N.E.2d 981; *People v. Camp* (1990), 201 Ill. App. 3d 330, 559 N.E.2d 26.

Despite the fact that defendant presented some evidence that he was intoxicated and/or under the influence of drugs at the time of the offense, the bulk of the evidence clearly established that defendant was capable of acting knowingly and intentionally. Even if we were to assume that McClendon was credible and that he correctly recalled attending a party with Valentine on the night in question, the evidence of intoxication, at best, established that Valentine drank a portion of two cases of beer along with approximately eight people, that he may have consumed some gin or rum and that he "tooted" some cocaine and shared, along with several others at the party, two marijuana cigarettes which may or may not have contained PCP. The amounts of the various intoxicants that Valentine actually consumed were not established.

This evidence must be balanced against the State's evidence, which established that Valentine was capable of maneuvering suffi-

ciently to be able to enter the victims' residence by way of a balcony on the victims' second-floor apartment; that he knew enough, initially, to hide behind a couch; that he responded to C.O.'s plea to not rape her in front of the children by stopping his assault on her and leading the children out of the room; and that later, when C.O. attempted to escape after struggling with her, he made a conscious decision to abandon the struggle with her and return to the children, locking C.O. out of the residence. Additionally, nearly everyone involved, including C.O., K.O., T.O. and all of the police officers at the scene, indicated that Valentine did not smell of alcohol, that he did not stagger or slur his words, and that he seemed coherent. Furthermore, the officers' testimony established that Valentine was capable of providing them with appropriate answers to questions. This evidence supports a finding that, whatever the level of Valentine's intoxication was, it did not suspend his ability to form a specific intent but only, perhaps, his inhibitions.

We are not unaware that much of Valentine's behavior was strange, especially his refusal to surrender K.O. upon the arrival of the police. However, all crimes such as these defy comprehension; thus, Valentine's unusual behavior should not be the standard upon which we measure his power to act intentionally.

Lastly, there was no evidence that Valentine was involuntarily intoxicated. Again, even assuming that McClendon's testimony was credible and accurate, he merely testified that the marijuana cigarettes which Valentine smoked with the several other persons at the party *may have* contained PCP. McClendon was only able to testify to his own belief that the cigarettes contained the PCP, based upon his alleged experience with the smell of PCP-laced marijuana. Additionally, McClendon could not say whether Valentine may have known or believed that the cigarettes contained PCP. Thus, both the contention that Valentine smoked PCP-laced marijuana, as well as the contention that Valentine did so unknowingly, were mere speculation.

Furthermore, even if the cigarettes did contain PCP and Valentine was ignorant of this fact, it is questionable whether such evidence supports a finding that he was involuntarily intoxicated. Valentine voluntarily smoked the marijuana cigarettes and was not induced to do so by some trick, artifice or force of an outside entity. See *People v. Larry* (1986), 144 Ill. App. 3d 669, 494 N.E.2d 1212.

■ We now turn to Valentine's final issue on appeal, *i.e.*, whether he was denied effective assistance of counsel at sentencing. Valentine claims that his counsel completely failed to argue any factors in mitigation at his sentencing hearing, thereby denying him adequate repre-

sentation at this critical stage of the criminal proceedings. We disagree.

There is a dual standard to be applied when assessing the effectiveness of defense counsel's performance. A defendant must first show that his attorney's performance was so deficient that it fell below prevailing professional norms. The evaluation of the attorney's performance should not extend into areas involving the exercise of professional judgment or trial tactic. Next, the defendant must show that his attorney's deficient performance actually prejudiced him so as to deny him a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *People v. Steidl* (1991), 142 Ill. 2d 204, 568 N.E.2d 837.

In view of this standard, we believe that defendant was not denied the effective assistance of counsel at sentencing. Defendant was represented by an able and well-respected southside attorney. Although it is true that defense counsel did not make a specific sentencing recommendation to the court, he did briefly argue that consecutive and extended terms were not warranted. Additionally, despite the fact that he did not particularize certain factors in mitigation, he adequately and passionately represented Valentine's best interests at the sentencing hearing. The record reflects that he implored the trial court to not succumb to "mob mentality" and to view the "totality of the circumstances." He also asked the court to remember that Valentine "was not himself" on the night of the incident. It is also noteworthy that defense counsel advised defendant not to exercise his right of elocution when it became apparent that Valentine would speak contrary to his own interests.

We believe that the record clearly reflects that the trial court was well aware of the circumstances of the case, as well as the factors in mitigation, and that defense counsel zealously represented Valentine at sentencing. Furthermore, Valentine makes no argument that the sentence he received was excessive or inappropriate. Consequently, we find no merit in defendant's argument that he received ineffective assistance of counsel at sentencing.

For all the reasons stated above, we affirm Valentine's conviction and sentence.

Affirmed.

GORDON and McNULTY, JJ., concur.