THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD MORALES, Defendant-Appellant.

First District (6th Division)   No. 1—97—4230

Opinion filed September 30, 1999.

Barbara C. Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a joint jury trial in the circuit court of Cook County, both defendant, Edward Morales, and his codefendant, Daniel Padilla, were convicted of two counts of murder (720 ILCS 5/9—1 (West 1992)) and sentenced to terms of natural life in the Illinois Department of Corrections. Previously, on direct appeal to this court, defendant, a Hispanic-American, contended that the State used its peremptory challenges in a discriminatory manner to exclude minorities from the jury. We found that the evidence "established a 'pattern' of strikes by the State against African-American and Hispanic venire members," and remanded the case to the circuit court "with directions to conduct a [*Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986),] hearing to determine whether the State can provide race-neutral explanations sufficient to rebut defendant's *prima facie* case." *People v. Morales*, No. 1—88—2812 (1996) (unpublished order under Supreme Court Rule 23).

On remand, the State offered explanations for its exercise of peremptory challenges as to certain African-American and Hispanic jurors, and defendant introduced testimony in rebuttal. The circuit court ruled that the State had successfully provided valid race-neutral explanations for excluding the minority jurors and affirmed defendant's conviction. Defendant appeals the circuit court's decision on remand and contends: (1) he is entitled to a new trial because the circuit court erred in finding that the State provided clear, reasonably specific, legitimate, race-neutral explanations for excusing African-American and Hispanic venirepersons during *voir dire*; (2) in the alternative, the case should be remanded for a new *Batson* hearing; and (3) the circuit court erred in denying defendant's request for the prosecutor's jury notes because the State waived its work product privilege. For the reasons given below, we reach only the first issue and accordingly reverse the judgment of the circuit court and remand for a new trial.

## BACKGROUND

At defendant's trial, after the court had questioned 25 prospective jurors, and the State had exercised 10 of its 16 peremptory challenges by striking one Caucasian, five African-Americans, two Hispanics, one Arab and one Pakistani, defense counsel objected to the State's use of its peremptories to strike minorities. The trial court denied the motion without prejudice, but advised the prosecutor that he was "on the bubble from now on. Any minority that is excused you are going to have to justify and [the] justification is going to have to satisfy me." The prosecutor responded by relying on *People v. Zayas*, 159 Ill. App. 3d 554, 510 N.E.2d 1125 (1987), and stated that a defendant must be of the same suspect class as the excluded jurors to raise a *Batson* objection. He also argued that the defendants had not made out a *prima facie* case of discrimination because two of the selected jurors were Hispanic and one was African-American. The trial court stated that it would not require the State to further explain its peremptory challenges because *Zayas* was the prevailing law in this court.

On appeal, our decision determined defendant had established a *prima facie Batson* violation that suggested the "possibility of racial motivation." We relied on a United States Supreme Court decision issued subsequent to *Zayas* that held "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race." *Powers v. Ohio*, 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366 (1991). In our order, we discussed the information elicited at *voir dire* and found that the excluded African-American

and Hispanic venire members had no apparent similarity in family life, marital status, occupation, friendships with police officers or attorneys, or as victims of crime.

Nine of the venirepersons challenged during *voir dire* were the subject of the *Batson* hearing on remand. At the hearing, after the State offered explanations for its peremptory challenges, defendant presented evidence in rebuttal.[1] He first called Antonio Calderon to testify. Calderon testified that, before coming to the United States in 1972, he lived in Mexico. He felt that he had learned English and understood the questions at jury selection. Calderon said that he did not recall being questioned about his understanding of English.

Next, defendant called Gail McDonald. She testified that she was called to the jury box at the beginning of jury selection in this case and never slept during the selection process. She added that she was excited about the case and had hoped she would be picked to serve as a juror.

Defendant also submitted an affidavit from Judge Earl Strayhorn, the judge who conducted the *voir dire* and presided over defendant's trial. In his affidavit, Judge Strayhorn stated that he did not have an independent recollection of the jury selection process in this case, and reading the transcript of the jury selection process did not refresh his recollection, but he had no reason to doubt the accuracy of the transcript. Despite having no independent recollection of the demeanor of the venirepersons, Judge Strayhorn stated he did not recall Gail McDonald sleeping during *voir dire* and that, if she had done this while seated in the jury box, he would have noticed. He did not recall Dawnita Hampton shaking her head during jury selection because such a movement would have triggered a question regarding her actions. Judge Strayhorn also did not recall Dexter Johnson being inattentive and sleepy during *voir dire*, because he would have noticed.

Judge Strayhorn added that he had read the *voir dire* of venire members Antonio Calderon and Askar Mohamed, and although he had no independent recollection of Calderon speaking with a heavy accent, Judge Strayhorn stated that his "normal practice and habit was reflected" in his questioning of Mohamed. If he detected that a person was having trouble speaking or understanding English he would normally say something on the record. This practice is reflected in Judge Strayhorn's question to Mr. Mohamed, "[a]nd you speak with an accent?"

At the conclusion of the hearing, on September 26, 1997, the

---

[1]The specific content of the State's proffered explanations are contained below in part II of this opinion.

circuit court ruled that the State's reasons for excluding certain venirepersons were race neutral and denied defendant's motion for a new trial. Specifically, the court stated:

> "I find that this is not a case of clear discrimination. That the [S]tate has set forth valid, clear, rational, and specific race[-]neutral reasons for all of the jurors that they had excluded.
>
> * * *
>
> I find the reasons are race neutral, they are valid, they are not pretextual, and the motion, there will be no new trial."

The court found that in each case where the State's objection was demeanor based, there was also a factual explanation in the transcript of the *voir dire* that corroborated the State's objection. The court then stated that the affidavit submitted by Judge Strayhorn was of little help because he did not recall the *voir dire* examination. Finally, the trial court judge also commented that she knew both of the assistant State's Attorneys and said "[t]heir reputations are widespread for having integrity."

## ANALYSIS

### I

■ We first address defendant's contention that the circuit court erred in finding the State's explanations at the hearing on remand to be legitimate, race-neutral reasons for the State's exercise of peremptory challenges against African-American and Hispanic venirepersons. In *Batson v. Kentucky*, the United States Supreme Court held that prosecutors who excluded potential jurors on the basis of their race violated the fourteenth amendment's guarantee of equal protection. *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In a subsequently decided case, the Supreme Court held that the defendant need not be of the same race as the excluded jurors to have standing to raise the constitutional violation. *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991).[2]

■ Batson provides a three-step mode of analysis for the evaluation of racial discrimination claims in jury selection. See *Purkett v. Elem*, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995) (*per curiam*) (emphasizing the distinct nature of steps two and three of the *Batson* analysis). The defendant must first make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the

---

[2]On direct appeal, we stated that the rule set forth in *Powers* applies retroactively to cases pending on direct appeal at the time *Powers* was decided. *Morales*, slip op. at 13, citing *People v. Coleman*, 155 Ill. 2d 507, 515, 617 N.E.2d 1200, 1205 (1993).

basis of race. If the defendant satisfies this initial burden, as in the case at bar, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. This step requires that the prosecutor give clear and reasonably specific, legitimate, race-neutral reasons. *People v. Randall*, 283 Ill. App. 3d 1019, 1025, 671 N.E.2d 60, 65 (1996). A race-neutral explanation is one based upon something other than the race of the juror. *Randall*, 283 Ill. App. 3d at 1025-26, 671 N.E.2d at 65 (offering an extensive list of acceptable race-neutral explanations). In assessing the explanation, the focus of the court's inquiry is on the facial validity of the prosecutor's explanation. *Hernandez v. New York*, 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866 (1991). The reasons given by the State need not rise to the level necessary to justify exclusion for cause, but they must constitute more than a mere denial of discriminatory motive. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24. However, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

At the third stage of the *Batson* analysis, the court must determine whether the defendant has met his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24; *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1865-66 (1991) (plurality opinion); *People v. Pecor*, 286 Ill. App. 3d 71, 73, 675 N.E.2d 141, 142-43 (1996); *People v. Randall*, 283 Ill. App. 3d at 1025, 671 N.E.2d at 65. In other words, once the State has come forward with its reasons for striking the venirepersons, the trial court must assess the facial validity of the prosecutor's explanations (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866) and determine whether the reasons given are sufficient or whether they are pretextual. *People v. Harris*, 129 Ill. 2d 123 (1989); *People v. Nunn*, 273 Ill. App. 3d 519, 652 N.E.2d 1146 (1995). Since the trial court's determination on this issue is factual and turns on credibility, its finding that the State excused minority venire members for race-neutral reasons will not be reversed unless it is clearly erroneous. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; *People v. Andrews*, 155 Ill. 2d 286, 293-94 (1993).

## II

We now examine each of the race-neutral explanations offered by the State to determine whether they are sufficiently race neutral and not pretextual. The following information was elicited during the *voir*

*dire* at trial and the accompanying reasons for the peremptory challenges were given by an assistant State's Attorney at the hearing on remand:

### A. Dawnita Hampton

■ This venireperson was African-American, a resident of the southwest side of Chicago for 29 years and had a twelfth-grade education. She worked as a mail attendant and had held that position for two years. Her mother worked as a nurse's aide and her father was a laborer, but she had not seen him since she was two years old. She lived with her husband, had no children, but had one brother and three sisters. Hampton stated that her home was broken into the year before the trial. She did not belong to any clubs or organizations and stated that she would maintain an open, unbiased, unprejudiced mind about the case.

At the *Batson* hearing, the prosecutor gave the following explanation for his challenge of Hampton:

> "She had not seen her father since she was two years old and she on several occasions looked over at the Defendant, looked over at us, myself and my partner, stared at us and shook her head which indicated to me hostility towards the prosecution there. Also the fact that she hadn't seen her father indicated a lack of family ties and family values which is something we always look for in jurors."

Defendant asserts that the State's explanation is pretextual because Hampton should not be judged by her father's behavior and this court has discouraged attributing a characteristic to a juror merely because a family member also has that characteristic. See *People v. Gaston*, 256 Ill. App. 3d 621, 628 N.E.2d 699 (1993). However, we think that the reasoning employed in *Gaston*, that the unemployed status of a venireperson's husband would not necessarily lead to sympathy for an unemployed defendant, is distinguishable. *Gaston*, 256 Ill. App. 3d at 623, 628 N.E.2d at 702-03. In the instant case, Hampton stated that she had not seen her father since she was two years old. This fact indicates that *she* lacked significant contact with a family member, a reason that has been upheld as race neutral. See *Randall*, 283 Ill. App. 3d at 1026, 671 N.E.2d at 65-66. We do not agree with defendant's claim that this basis for exercising a peremptory challenge is the equivalent of attributing the characteristic of a family member to Hampton.

We do wish to note, however, that the State's reference to a lack of "family values" is as baseless as an unfounded claim that postal employees are dishonest and have no respect for the law. See *People v. Sims*, 249 Ill. App. 3d 246, 618 N.E.2d 1083 (1993); see also *Randall*,

283 Ill. App. 3d at 1027, 671 N.E.2d at 67 (rejecting State's claim that city employees are more liberal). Nevertheless, we find the State's explanation concerning Hampton's lack of family ties to be race neutral under *Batson* and discriminatory intent is not inherent in the explanation, particularly since she was the only venireperson to provide this type of information.

Next, we address the State's explanation that Hampton was challenged because she stared at the prosecutors, looked at defendant and shook her head. While it is true that demeanor-based challenges must be closely scrutinized because they can easily serve as a pretext for a discriminatory challenge (*People v. Banks*, 241 Ill. App. 3d 966, 976, 609 N.E.2d 864, 871 (1993)), according to *Batson*, we "generally rely on the trial judge's determination *** because exclusion due to a venire [member's] demeanor forms the historical basis of the peremptory system." *Gaston*, 256 Ill. App. 3d at 622, 628 N.E.2d at 700, citing *People v. Baisten*, 203 Ill. App. 3d 64, 80, 560 N.E.2d 1060 (1990). Here, we are presented with a conflict. Judge Strayhorn's affidavit states that he did not recall Hampton shaking her head during the *voir dire* proceedings because such a movement would have caught his attention and prompted him to question her actions. At the same time, the court on remand had the opportunity to evaluate the credibility of the prosecutor's explanations and chose to agree with the State. Absent a specific inconsistency or error in the court's findings, we cannot say that it was clearly erroneous. Accordingly, we also find this explanation to have been race neutral and not discriminatory.

### B. Paula Davis

■ This venireperson was African-American, single, a resident of the north side of Chicago, had lived in Chicago for three years and worked as salesperson. Prior to living in Chicago, she lived in New York and Florida. Her father and mother were both retired and lived in Jacksonville, Florida. She held a B.S. degree in nutrition. She had two brothers, one of whom worked for the federal government and the other was a hairdresser. She had several friends who were lawyers but stated that this would not affect her evaluation of police testimony. Davis was also a member of the Junior League of Chicago, the National League of Negro Women, and a sales group, the President's Club. When asked if the court needed to know anything else, she stated "[j]ust I'm on commission sales so ***."

At the *Batson* hearing, the State explained that it challenged Davis because she raised the fact that she worked as a salesperson on commission, and if she was hesitant about missing work she might not be attentive at trial.

Challenges exercised as to a venire member's type of employment or possibility of losing income generally have been deemed race neutral. *People v. Lovelady*, 221 Ill. App. 3d 829, 838, 582 N.E.2d 1217, 1225 (1991), citing *People v. Batchelor*, 202 Ill. App. 3d 316, 323, 559 N.E.2d 948, 953 (1990); *People v. Harris*, 129 Ill. 2d 123, 544 N.E.2d 357 (1989). Such challenges are pretextual, however, if exercised as to one race of potential jurors but ignored as to jurors of another race. *Lovelady*, 221 Ill. App. 3d at 839, 582 N.E.2d at 1225. Defendant contends that the State's explanation was not applied consistently because it used Davis' concern over the possible length of the trial and its effect on her job to explain a challenge to her, yet never challenged Michael Hummel, a white juror who expressed concern about the length of the trial and how it would interfere with his last semester of college. The State asserts that Hummel is distinguishable from Davis because he originally thought the trial might last three months, but the trial court explained that it would only be a couple of days. The State adds that Davis was questioned after Hummel, so she should have known how long the trial would last and, furthermore, loss of work is far more significant than missing "a few days' classes."

Essentially, the State asks this court to acknowledge that a college student majoring in product design in his last semester before graduation will worry less about missing classes while serving as a juror than a salesperson who works on commission. We find this explanation to be pretextual. If Davis expressed concern over the length of time she would be required to spend away from her work obligations during a trial and the State offered this as the reason for its exercise of a peremptory challenge, then it is reasonable to assume other venirepersons with the same hesitations would be challenged. Here, that did not happen. The defendant in this case is Hispanic and he stood trial for the murder of two white males. This court has repeatedly questioned the inconsistent use of peremptory challenges as to persons having similar characteristics when the party raising the trait chooses to retain white venire members. See, *e.g.*, *Lovelady*, 221 Ill. App. 3d at 839, 582 N.E.2d at 1226. In the instant case, the State has not offered any other meaningful explanations for its use of a peremptory as to Davis. Due to the inconsistency of the State's explanation we cannot understand why Hummel was not challenged, particularly since his girlfriend had been hit and robbed two weeks before the trial, but the police had not apprehended anyone for the offense. This fact could have caused Hummel to view the prosecution and/or the testifying police with some skepticism. Yet Hummel sat on the jury. The conclusion that best explains this inconsistent use of peremptory challenges is racial motivation. Davis was an African-American woman and a

member of the National League of Negro Women. While we understand that at step two of the *Batson* analysis even a minimally persuasive explanation may be deemed race neutral, step three allows a court to find an implausible explanation pretextual. *Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995). Accordingly, since we question the legitimacy of the State's reason for excusing Davis, we find the explanation to be unsatisfactory and a violation of *Batson*.

### C. Jose Urbina

This venireperson was Hispanic, a resident of the south side of Chicago, and married with two children. He had worked as a bank clerk for 12 years and his wife worked at a textile company as a machine operator. He served as a juror four years before in a civil case but said that he understood that the facts of the prior case were separate from the new case. His hobby was renovating his house.

At the *Batson* hearing, the prosecutor stated that he used a peremptory challenge as to Urbina because both of his prior residences were in areas of heavy Hispanic gang involvement. Since the defendants in the case at bar were members of a street gang, the prosecution thought that some jurors might fear gang retaliation.

Illinois law allows a prosecutor to excuse a prospective juror if he/she "lives in an area with particular attributes which the State considers undesirable for a juror." *People v. Williams*, 252 Ill. App. 3d 635, 644, 625 N.E.2d 144, 150 (1993). For example, in *People v. Johnson*, 218 Ill. App. 3d 967, 578 N.E.2d 1274 (1991), the appellate panel upheld the exclusion of a venire member because she lived and worked in a high-crime area. And in *People v. Nunn*, 273 Ill. App. 3d 519, 526, 652 N.E.2d 1146, 1151 (1995), this court concluded a challenge exercised as to an elderly, widowed woman who lived alone in a "rough" neighborhood was sufficiently race neutral. The cases do not necessarily require a nexus between specific gangs in the venireperson's neighborhood and the gangs at issue at trial. The trial record in the case at bar substantiates the State's concern that Urbina lived in a neighborhood with gang activity. In fact, during *voir dire*, he specifically referred to the cross streets in his neighborhood, so the attorneys were aware of where he lived. Therefore, we find the State's challenge as to Urbina was race neutral and not violative of *Batson*.

### D. Antonio Calderon

This venireperson was Hispanic, a 15-year resident of the southwest side of Chicago and had attended high school in Mexico. He was married, had four children and his wife did not work outside the

home. He was employed as a laborer for the Chicago Board of Education and had held that position for three years. He coached little league baseball during the summer and read the sports section of the Chicago Sun-Times.

■ At the *Batson* hearing, the prosecutor explained that he used a peremptory challenge to strike Calderon because he had gone to high school in Mexico and "it was obvious that he had some type of heavy accent, potentially a language problem." As a result, the prosecution worried that he might miss some of the testimony because of language difficulties or slang terminology referring to gangs. Defendant asserts that the State has offered a pretextual basis for its challenge because Calderon's accent does not necessarily reflect on his ability to understand English and the record of *voir dire* does not substantiate the State's claim. On remand, the trial court commented that Calderon had "an extremely thick accent." While it is true that we should defer to the trial court's analysis of the facts and its credibility assessments, we find the State's explanation for its challenge of Calderon is not supported by the record. During *voir dire*, Judge Strayhorn asked Mr. Calderon over 30 questions and covered many different topics, including education, family, employment, military service, hobbies, and connections to law enforcement. At no point during this colloquy did Calderon offer an answer that was unresponsive to the question asked, unintelligible or at all indicative of an inability to understand English. This fact is significant considering Judge Strayhorn's questioning of another venire member, Askar Mohamed. While questioning Mr. Mohamed, Judge Strayhorn noted that he spoke "with an accent" and asked Mr. Mohamed when he had become a naturalized citizen of the United States. No similar questions were asked during the questioning of Calderon. This distinction is significant because Judge Strayhorn's affidavit reveals that whenever he noticed that a juror had difficulty with English, as with Mr. Mohamed, he would engage in further questioning to determine the person's understanding of English. However, Judge Strayhorn did not make any observations about an accent when questioning Calderon and never asked questions about his ability to understand English.

The cases cited by the State, *People v. Wiley*, 165 Ill. 2d 259, 651 N.E.2d 189 (1995), and *Hernandez*, do not support the State's explanation. *Wiley* dealt with a venire member who was under the influence of alcohol during *voir dire*, a fact that was noticed by both the prosecutor and the court. *Wiley*, 165 Ill. 2d at 279, 651 N.E.2d at 198. And in *Hernandez*, the prosecutor expressed concern that Spanish-speaking jurors might not defer to the official translation of testimony given in Spanish. However, in the instant case, all testimony was in English, there

is no record of any translation, and there is no evidence that Calderon's communications skills were impaired by alcohol or drugs.

Defendant's brief cites to *United States v. Alcantar*, 897 F.2d 436, 439 (9th Cir. 1990), which noted the logical flaw in arguing that a person who has a foreign accent must have trouble understanding English. While the *Alcantar* court declined to "reach the question of whether Spanish-speaking ability can ever be a neutral justification for striking jurors under *Batson*," it did acknowledge that the court of appeals had recognized that Spanish language is closely tied to Hispanic identity. *Alcantar*, 897 F.2d at 440; citing *Gutierrez v. Municipal Court*, 838 F.2d 1031 (9th Cir. 1988), *vacated as moot*, 490 U.S. 1016, 104 L. Ed. 2d 174, 109 S. Ct. 1736 (1989). Thus, there is a conflict in the State's explanation. If the prosecutors really challenged Calderon because he had trouble understanding English, there is no evidence in the record to support this conclusion. But if the State struck Calderon from the venire because he had a Spanish accent, then we can only conclude that he was challenged because he was Hispanic.

The circuit court apparently agreed with the State's explanation for its challenge of Calderon when the court referred to his "thick accent" and stated:

> "[I]s it unreasonable, is it implausible or fantastic, for an assistant [S]tate's [A]ttorney to believe that because a person speaks with an extremely thick accent, that they might not be able to understand the proceedings?"

Although we recognize that it is possible for the circuit court judge and Judge Strayhorn to have had very different interpretations of an accent, it is unclear how a venireperson's accent is related to his or her ability to understand trial testimony. We are wary of a challenge to a Hispanic venire member when the defendant was Hispanic, the victims were white, the key occurrence witnesses were white and defendant has stated a *prima facie* case for a *Batson* violation. While it is true that the State's explanation need not make complete sense, it must be legitimate and not a pretext for removing a minority. Here, Calderon was struck from the venire either because he had a Spanish accent or for the unsupported reason that his accent would not allow him to understand testimony. Since these reasons are either pretextual or implausible, we conclude that Calderon was challenged because he was Hispanic. Accordingly, the circuit court's decision as to his exclusion was erroneous.

E. Magnolia Powell

■ This venireperson was African-American, divorced and a resident of the southeast side of Chicago for 24 years. She held a college

degree, worked as a fifth- and sixth-grade teacher in a Chicago school and was a member of the teacher's union. She had no children. She also stated that she had a friend who worked in law enforcement in Indiana. When asked about the nature of the case, she responded that the defendants were "awful young."

At the *Batson* hearing, the State explained that it exercised a peremptory challenge as to Powell because she indicated that she had a problem judging young people. Since both defendants were young, the prosecution feared that she could not be fair.

In *People v. Valentine*, 221 Ill. App. 3d 1082, 1087, 582 N.E.2d 1338, 1342 (1991), the State challenged a venireperson who had worked as a teacher's aide for 20 years, on the grounds that her work with children might cause her to be sympathetic to a 19-year-old defendant. The appellate panel upheld that challenge as race neutral. We find that the challenge in the instant case did not violate *Batson*. Powell taught fifth and sixth grade and commented on the age of the defendants during *voir dire*. See *Nunn*, 273 Ill. App. 3d 519, 652 N.E.2d 1146 (upholding challenge based on the assumption that Chicago employees who work with students are more forgiving). Her employment and attitude towards young people were race-neutral traits that are supported by the trial record. For this reason, we find no error.

F. Dexter Johnson

■ This venireperson was African-American and a 15-year resident of Oak Park who worked for Jewel Warehouse and had held that position for six years. He was a high school graduate who also played the drums. He had a cousin who was killed in a shooting three years before the trial. He said that fact would not cause him to resent the police and he "guess[ed]" he could separate the facts of his cousin's murder from those in this case. The trial judge responded that he would have to be more definite, so Johnson responded that he really did not know but he "would try to be fair."

At the *Batson* hearing, the State proffered that it excused Johnson because he was a drummer in a band, worked nights, "appeared to be inattentive, possibly sleepy" and equivocated when asked whether he could give both sides a fair trial. Defendant argues that the trial record does not support the State's proffer.

During *voir dire*, Johnson told the court that he worked at a warehouse and that he played the drums. The State argues that if Johnson worked at a warehouse during the day, his hobby of drumming would have to take place at night, and playing in a band at night would cause him to be sleepy.

We find that the State's argument is speculative and has no basis

in the record. At no time during *voir dire* did Johnson ever say that he played drums in a band. Furthermore, he never mentioned what time of day he worked or if he ever even performed his drumming skills. The State bases all of its assertions on the fact that none are inherently discriminatory. Yet, if the State fails to articulate a legitimate (*i.e.*, based in fact) race-neutral reason for its peremptory challenge of even one venireperson, then the defendant's conviction must be reversed and a new trial granted. *People v. Coleman*, 155 Ill. 2d 507, 617 N.E.2d 1200 (1993).

However, the State did offer multiple bases for its challenge of Johnson. When a prosecutor does not rely solely on one reason in the explanation of his/her peremptory challenge, the challenge may be deemed race neutral for another reason. *Lovelady*, 221 Ill. App. 3d at 839, 582 N.E.2d at 1226. We find that his equivocation on the issue of whether he could set aside the facts of a crime involving his cousin was a race-neutral basis for the State's exercise of a peremptory challenge that is supported by the trial record. Thus, we find no *Batson* violation.

G. Gail McDonald

■ This venireperson was African-American and had lived on the west side of Chicago for one year prior to trial. Before that she lived in Forest Park for two years and Oak Park for two years. All of her residences were on the west side of Chicago or Cook County. She and her husband had been married for eight years, they had no children and she worked in the computer department of a department store for nine years. She liked to read Ebony and Jet magazines, novels and the Chicago Sun-Times.

At the *Batson* hearing, the prosecutor stated that he exercised a peremptory challenge as to McDonald because she had lived at three different addresses during the five years prior to the trial, and this indicated a lack of community ties. The prosecutor also said that he "noted that she had been sleeping during some of the *voir dire*" and might not be attentive during a trial.

On the issue of whether McDonald was asleep, the parties argue as to whether Judge Strayhorn would have noticed a sleeping venireperson and that at one point he commented on "droopy eyelids" before calling a recess. However, we need not address that issue since the supreme court has concluded that a prosecutor's concern as to a venire member's ties with the community "is sufficient to rebut defendant's *prima facie* showing of a *Batson* violation." *People v. Morgan*, 142 Ill. 2d 410, 435-36, 568 N.E.2d 755, 761 (1991) (referring to an unemployed venireperson who had been a resident at his cur-

rent address for only five years). Here, the record corroborates that McDonald lived at three different addresses during the five years prior to trial. Therefore, we find that her challenge was not violative of *Batson*.

## H. Carmen Smith

■ This venireperson was African-American and had lived on the south side of Chicago with her parents for 18 years. Her father was an assistant principal at a high school and her mother was an elementary school teacher. She studied psychology for two years in college and then spent her third year at a business college before graduating. She worked as an appointment coordinator with a hospital plan and had worked there for five weeks. She had two friends who were police officers. She said the fact that two of her friends were involved in law enforcement would not affect her evaluation of a police officer's testimony. When asked whether the nature of the case bothered her, she said, "[j]ust to some degree" but she could work around that.

At the *Batson* hearing, the prosecutor explained that he used a peremptory challenge as to Smith because she had said the nature of the case bothered her and the fact that she was a psychology major might cause her to "analyze too much into the witnesses here, try to read too much into what the witnesses were saying or didn't say."

During *voir dire*, Judge Strayhorn asked Smith about the nature of the charges in the case and whether she had "a feeling one way or another about serving as a juror in this kind of case." She responded, "[j]ust to some degree only because—only because of the nature of the case." But when the judge asked her if she could "work around that and judge this case with an open mind," she said "[y]es." Defendant points to a Caucasian juror, Lillian Den Bensten, who said that the nature of the charges in the case was "scary," but she was not challenged by the State. He argues that this demonstrates an inconsistent use of peremptory challenges. However, Smith showed more hesitancy about jury service, and this has been upheld as a race-neutral reason for excusing a juror. *People v. Andrews*, 155 Ill. 2d 286, 614 N.E.2d 1184 (1993). Therefore, we find no *Batson* violation.

In addition, the State's reference to Smith having studied psychology in college should also be considered a valid race-neutral explanation. While the case that the State refers to, *People v. Campbell*, 264 Ill. App. 3d 712, 636 N.E.2d 575 (1992), is distinguishable on its facts and does not support the State's argument, Smith's study of psychol-

ogy is race neutral and was a characteristic that set her apart from other venirepersons.[3]

I. Bernadette Whitfield

This venireperson was African-American and had lived on the southeast side of Chicago with her parents for 20 years. She had a degree in accounting and was working toward her master's. She worked at Playboy Enterprises International Publishing in editorial systems. She knew a police officer but never talked with him about his police work. She had been robbed four years before the trial, and the perpetrator used a gun. She said she did not hold it against the police that they never apprehended anyone for the crime and she would be able to separate the facts of that crime from the one at trial.

■ At the *Batson* hearing, the prosecutor stated that he used a peremptory challenge as to Whitfield because she was an editor for Playboy Magazine and "[t]his is the type of publication that does not take a strong stand toward law enforcement." He added that she had a baseball cap on in court and that showed disrespect to the court system and the legal system. The Illinois Supreme Court has upheld a venire member's failure to remove a hat in court as a race-neutral basis for exercising a peremptory challenge (*People v. Williams*, 164 Ill. 2d 1, 18-19, 645 N.E.2d 844, 851-52 (1994)). Since the record does not conflict with this assertion, we need not address the issue of Whitfield's employment at Playboy magazine, and we find that there was no *Batson* violation as to Whitfield.

## III

■ Over a century ago the United States Supreme Court stated that a defendant has no right to a "jury composed in whole or in part of persons of his own race." *Staider v. West Virginia*, 100 U.S. 303, 305, 25 L. Ed. 664, 665 (1880). We also recognize that the peremptory challenge is an important trial tool. But purposeful racial discrimination in selection of a jury violates a defendant's right to equal protection. *Batson*, 476 U.S. at 86, 90 L. Ed. 2d at 80, 106 S. Ct. at 1717. In the case at bar, we find that the record of *voir dire* does not support the State's proffered reasons for exercising peremptory challenges as to Davis and Calderon. Because the State failed to provide race-neutral explanations for the exclusion of Davis and Calderon that were non

---

[3]In *Campbell*, the court upheld the State's explanation that a social worker would rely on her own training and beliefs in evaluating an expert on mental health when mental health was at issue in the case. *Campbell*, 264 Ill. App. 3d at 731, 636 N.E.2d at 588. In the instant case, there was no testimony as to psychological phenomena.

pretextual, the circuit court's decision on remand was clearly erroneous.

Finally, since defendant's second and third contentions of error arise out of the first issue and will not arise on retrial, we need not address them.

Accordingly, for the aforementioned reasons, we reverse the decision of the circuit court of Cook County and remand for a new trial.

Reversed and remanded.

ZWICK, P.J., and CAMPBELL, J., concur.